**ALESAYI BEVERAGE CORPORATION,**
**Plaintiff and Counterclaim**
**Defendant,**

v.

**CANADA DRY CORPORATION,**
**Defendant and Counterclaim**
**Plaintiff.**

**No. 89 Civ. 7221 (RLC).**

United States District Court,
S.D. New York.

June 26, 1996.

Paul, Hastings, Janofsky & Walker, New York City (Samuel D. Rosen, Michael T. Mervis, Paul L. Perito, Robert E. Pokusa, of counsel), Bartels & Feureisen, White Plains, NY (John R. Bartels, Jr., of counsel), for Plaintiff.

Shearman & Sterling, New York City (Dennis P. Orr, Kathryn Tabner, Tracey L. Cushing, Allana F. Stark, of counsel), for Defendant.

### OPINION

ROBERT L. CARTER, District Judge.

In this action, Plaintiff Alesayi Beverage Corporation ("Alesayi") seeks damages resulting from an alleged breach of contract and breach of express and implied warranties by defendant Canada Dry Corporation ("Canada Dry"). Canada Dry counterclaims, alleging breach of contract by Alesayi and damages. A bench trial was held from December 4, 1995 to December 12, 1995.

## I.

The following facts were established at trial. On February 6, 1969, Plaintiff Alesayi[1] entered into a licensing agreement (the "License Agreement" or "Agreement") with defendant and counterclaim-plaintiff Canada Dry under which Alesayi gained the exclusive right to use Canada Dry trademarks, including the Canada Dry Shield, in that part of the Kingdom of Saudi Arabia lying west of the 45 degree longitude.[2] The License Agreement had an initial term of five years; thereafter, the agreement was to be renewed, year by year unless terminated by either party for any reason. A party had to give six months notice of termination before the expiration of the then-current term. (Joint Exh. 1 at 4). Throughout the relationship, Alesayi's main contact with Canada Dry was through Kameel Shabb, the Senior Vice-President for Canada Dry for the Middle East, whose main office was in Beirut, Lebanon.

At all relevant times, Alesayi was engaged in the business of bottling and selling carbonated beverages, commonly called soft drinks. (Am.Compl. at ¶ 1). At its bottling facility in Jeddah, Saudi Arabia, Alesayi produced soft drinks in various containers that were changed according to technological advances and market forces. To make the soft drinks, Alesayi used Canada Dry flavor extracts that were produced in Canada Dry's extract manufacturing plant in Ireland. These extracts were transported by unrefrigerated cargo ship to the Jeddah port in Saudi Arabia for use by Alesayi in its Jeddah facility. (Tr. at 142–43, 144).

In the early 1980's,[3] Canada Dry introduced Orange 18C, a modification of the extract for orange soda bottled by Alesayi. The units of Orange 18C extract were labeled

---

1. Sheikh Ali Abdullah Alesayi is the sole proprietor of Alesayi.

2. In February, 1983, the contract was amended to give Alesayi the non-exclusive right to sell and distribute Hi–Spot east of the 45 degree longitude. In June, 1983, the contract was amended to give Alesayi the non-exclusive right to sell and distribute the other contracted-for Canada Dry beverages between the 45 degree longitude and

48 degree longitude. (Joint Exh. 1 at # 088797, 088799; Tr. at 343–44).

3. At trial, the parties contested the date from which Alesayi's claims were viable. Having resolved the issue as discussed in Section IV–A, Alesayi may recover on claims for acts accruing from November 1, 1982.

with expiration dates indicating the effective shelf life. For the labeled period to have meaning, however, Canada Dry informed Alesayi that the extracts must be stored in clean, sanitary conditions, protected from direct sunlight, stored at appropriate temperatures, and rotated by age and delivery date. Canada Dry also suggested that the extracts be used on a first-in, first-out basis. (Tr. at 148–49, 166–67, 319–20).

Apparently, however, Canada Dry adopted a labelling system with dual meaning: the technical staff of Canada Dry understood that the extracts would expire according to expiration periods set by the appropriate staffpersons; but from 1984 and onwards, the labels on units shipped to bottlers indicated expiration periods that exceeded the understood and accepted periods of time. According to internal Canada Dry technical documents dated February, 1982, Canada Dry set a six-month expiration period for Orange 18C. (PX 166).[4] At some point in 1984, the true expiration period was extended to nine months and then to twelve months.

(Tr. at 246–47; DX 1N). Simultaneously in 1984, however, Canada Dry decided to comply with the repeated requests of Shabb to label all of the flavor extract units (e.g., Lemon–Lime, Cola, and Ginger Ale) shipped to the Middle East with an eighteen-month expiration date, (Tr. at 240–41), so as to prevent government authorities from dumping shipments of expired extracts unloaded from the cargo ships at the entry port in Jeddah, Saudi Arabia.[5] Despite its decision to circumvent problems with government authorities, Canada Dry did not apply the artificial expiration date to the Orange 18C extract; this extract retained its established twelve-month expiration on the label.[6]

In 1982 and 1983, Alesayi verbally complained to Shabb that the orange extract resulted in orange soda that was off-taste and/or off-color, (Shabb Testimony, Tr. at 127, 154, 155, 160), and made one written complaint to Canada Dry on the same subject prior to 1984. (Tr. at 153). By late 1984 and early 1985, Alesayi complained to Cana-

4. *See also* PX 184, Memo from Nicola Ayyash, to Ian Ironmonger in London ("we received a telex from H. Hoehmann on April 17, 1984; stating expiry periods of [e]xtracts. Figures mentioned in said telex are different from the ones revised on 2/5/82 that we are currently using ... Orange 18C as per Hoehmann's Telex of April 17, 1984 [is] 12 months ... Orange 18C as per Memo dated 2/5/82 [is] 6 months."). Although the six month expiration period was contested at trial as incorrect due to a typographical error in Canada Dry's 1982 Technical Bulletin (Shabb Testimony, Tr. at 242), Canada Dry did not produce the evidence it promised at trial to show that Canada Dry labeled the extracts with a nine month—rather than a six month—expiration period in 1982. (Tr. at 245–46, 247, 706).

5. *See* PX 183, Telex of April 18, 1984, from Shabb to Herbert Hoehmann, head of Canada Dry Corporate Concentrate Manufacturing ("However we have faced problems whereby the [M]unicipality and/or [H]ealth [D]epartment insisted on dumping the extracts even if it was one day after the expiry date mentioned on the jug. To overcome this we made it 18 months even though all bottlers know that they have to use it well before that date.... As you note, Neville [Williams] questions the necessity for a 'cover' 18 month labelling and feels that we are better by restricting less durable extracts to maximum 'lasting' periods."); PX 186, Canada Dry Inter–Office Communication of May 10, 1984, from N.G. Williams, President of Canada Dry International, to Shabb ("Following discussions with

David and Herbert and subsequently with you in San Francisco, I have very reluctantly agreed to the following: (1) with the exception of Orange, all extracts for the Middle East will indicate a shelf life of 18 months; (2) For Orange, the shelf life labelling will indicate 12 months with the single exception of Syria ..."); PX 187, Canada Dry Inter–Office Communication of May 15, 1984 from David J. Thwaites, Dir. of Technical Operations for Canada Dry International who was responsible for manufacturing extracts at the Ireland facility, to Nicola Ayyash, a service engineer in Canada Dry's Beirut office ("The definitive list is the [shelf-life] statement of memo 2/5/82. The other [shelf-life] statements have been reached at Kameel's request, that will appear on Middle East extracts only due to the local health regulations in force ... This is purely for local authorities and is not to be taken internally as the expected or recommended shelf lives.").

6. PX 185, Memo of May 9, 1984 from K. Shabb to Herbert Hoehmann ("[O]range will have an expiry date of 18 months for all orders to Syria, and *12 months for all other bottlers.* All other extracts are to continue having an 18 month expiry date."); PX 187, Canada Dry Inter–Office Communication of May 15, 1984 from David J. Thwaites to Nicola Ayyash ("[W]e have agreed with Kameel that all extracts, other than Orange 18C, will show an 18 month [shelf] life. Orange will show 12 months except for Syria"); *see also* PX 186, note 5, *supra.*

da Dry that it had received many complaints about Canada Dry's orange soda and that large quantities of orange soda were being returned to Alesayi from the market. (Shabb Testimony, Tr. at 162; Tr. at 669, 670–71).

In mid–1984, Alesayi told Shabb that it needed to find other bottling opportunities in order to sustain its business because the plant was underutilized due to a decrease in demand for Canada Dry soft drinks. (Tr. at 299–300).[7] Pursuant to a verbal agreement with Fifa Beverage Co. ("Fifa"), (Tr. at 428), an independent, limited liability company owned by two of Sheik Alesayi's sons but established with Sheik Alesayi's financial assistance, Alesayi began to bottle drink products, including an orange drink product, for Fifa. (Tr. at 388–89, 406–09).

Upon learning of Alesayi's bottling of Fifa drink products, Canada Dry objected and warned Alesayi in August, 1984, that its involvement with Fifa constituted a breach of the dilution of efforts clause—Article 10—of the License Agreement. (DX 1T). On October 1, 1984, Canada Dry invoked the 30 day warning period pursuant to Article 13 of the License Agreement during which Alesayi was to discontinue the Fifa line of products or else Canada Dry would cancel the License Agreement. (DX 1U). Canada Dry rejected Alesayi's response that Fifa was its own legal entity and instead charged that the participation of Alesayi's management in the marketing of Fifa constituted a willful promotion of Fifa products by the Alesayi company. (DX 1W).

However, on November 14, 1984, Canada Dry agreed to let Alesayi manufacture Fifa products and to sell them to Fifa if Alesayi relocated all sales, distribution, marketing and activities other than manufacturing relating to Fifa away from Alesayi's bottling plant and Alesayi's sales and distribution personnel. (DX 1Y; Tr. at 361).

Subsequently, the Fifa manufacturing process was moved off the Alesayi premises, but then was returned back again in early 1985. (Tr. at 432–33). Between 1984 and 1985, Alesayi trucks were used for 100 trips—out of 12,000 trips that year—to deliver Fifa products. (Tr. at 418–19). After 1985, the number of Fifa deliveries by Alesayi trucks increased. (Tr. at 421). An agreement signed in 1988, but dated March 22, 1985, between Alesayi and Fifa indicated that Alesayi agreed to bottle and distribute Fifa's carbonated beverages, juices and syrups for a commission from Fifa per each carton sold. Alesayi also agreed to bear "all advertising expenses and any other expense relating to shipment of samples, travel expenses, freight charges, etc., which relate to the development of the products." (DX 1Y.1).

Canada Dry continued to supply Alesayi with orange extract up through November 1985 and responded to Alesayi's complaints that the market was rejecting its orange soda by reimbursing Alesayi for half of the cost of products returned that year. (DX 30, DX 3Q, DX 3S; Shabb Testimony, Tr. at 335–36, 382–83). The sum, approximately $100,000, included the price of the orange extract. *Id.* Canada Dry further instructed Alesayi to perform "sunlight tests" on Canada Dry's orange soda and the other orange soda brands in the market to assess the sodas' stability in direct sunlight. *See e.g.,* PX 565.

Alesayi stopped ordering extract from Canada Dry in November, 1985. Alesayi's sales of Canada Dry dropped from sales approximating 15 million liters in 1983 and 1984 to 9.1 million liters in 1985 and to 2.3 million liters in 1986. In 1986, Alesayi ceased selling orange soda in cans altogether. From 1985 to 1986, Fifa sales dramatically increased threefold. (PX 958; DX 6J).

In December, 1987, Canada Dry sent Alesayi a letter informing Alesayi that it accepted Alesayi's recent order for extracts, for the stated purposes of using up its inventory of containers, as further indication that Alesayi did not want to continue to promote Canada Dry. (PX 268). Although the December, 1987 letter was not sent by certified or registered mail as required by Article 21 of the Agreement, the parties subsequently acted

---

7. *See also* DX 1Y at # D07639, Letter from Alesayi to Shabb ("we ... explained to you the economical reasons that prompted us to take the decision to utilize part of out plant's capacity through contract bottling for independent companies").

as if in fact the contract was terminated at that point.

Alesayi initiated this action in October, 1989. Soon thereafter, Sheikh Alesayi instituted an action in March, 1990, against Canada Dry before the Grievances Board of the Tenth Commercial Circuit of the Kingdom of Saudi Arabia ("the Grievances Board") for breach of contract arising from defective extracts, defective bottles, loss of commercial reputation and customers' confidence, and loss of capital invested over the period of time from 1970 through October, 1982. Alesayi claimed damages of 46,751,427 Saudi Riyals. (Pl.'s Memo. of Law in Oppn. to Def's Mot. to Enjoin Prosecution of Foreign Action, Exhs. B–C; Def's Memo of Law in Supp. of Mot. to Enjoin, at 2). In July, 1990, this court denied Canada Dry's motion to enjoin Alesayi from concurrently prosecuting Canada Dry in Saudi Arabia. *Alesayi Beverage Corp. v. Canada Dry Corp.*, No. 89 Civ. 7221, slip op. (S.D.N.Y. July 6, 1990) (Broderick, J.). The Second Circuit affirmed. *Alesayi Beverage Corp. v. Canada Dry Corp.*, 930 F.2d 909 (2d Cir.1991).

In October, 1995, the Grievances Board denied Sheik Alesayi's claims. In March, 1996, the Fourth Scrutiny Court upheld the Grievances Board's decision.

## II. Claim/Issue Preclusion

Canada Dry argued that the decision by the Saudi Arabian courts precluded this court's consideration of Alesayi's claims. Canada Dry's position necessarily raised the issue of whether the Saudi courts' decisions have effect in this court.

█ Under federal law, the recognition of foreign judgments and proceedings is governed by principles of comity. *Hilton v. Guyot*, 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895); *Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 65 B.R. 466, 468 (S.D.N.Y. 1986) (Carter, J.), *aff'd*, 825 F.2d 709 (2d Cir.1987). In *Hilton v. Guyot*, the seminal

case in the area of enforcement[8] of foreign judgments, the United States Supreme Court defined comity as "the recognition which one nation allows within its Territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton*, 159 U.S. at 164, 16 S.Ct. at 143. The Court held that if the foreign forum provides a full and fair trial before a court of competent jurisdiction, under a system of procedural fairness akin to the principles governing United States courts, and there is nothing to show either prejudice or fraud in the foreign forum, then "the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh ... upon the mere assertion of [a] party that the judgment was erroneous in law or in fact." *Canadian Imperial Bank of Commerce v. Saxony Carpet Co., Inc.*, 899 F.Supp. 1248, 1252 (S.D.N.Y.1995) (Batts, J.) (quoting *Hilton*, 159 U.S. at 202–03, 16 S.Ct. at 158).

█ It is well established that United States courts are not obliged to recognize judgments rendered by a foreign country, but may choose to give *res judicata* effect to foreign judgments on the basis of comity. This Circuit has consistently extended comity "whenever the foreign court ha[s] proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir.1987); *Pariente v. Scott Meredith Literary Agency, Inc.*, 771 F.Supp. 609, 615 (S.D.N.Y.1991) (Leisure, J.). The court has previously found that it is primarily principles of fairness and reasonableness that should guide domestic courts in their preclusion determinations. *Gordon & Breach Science Pub. v. Am. Inst. of Physics*, 905 F.Supp. 169, 179 (S.D.N.Y.1995) (Sand, J.).

8. Generally, the principles of comity are applied in two contexts: to enforce foreign judgments in the United States and to recognize foreign court proceedings. *Elgin Sweeper Co. v. Melson Inc.*, 884 F.Supp. 641, 650 (N.D.N.Y.1995). *See also Victrix Steamship Co.*, 65 B.R. at 470 ("while comity may require recognition of a foreign judg- ment—meaning that [the court] may be required to give it res judicata and collateral estoppel effect"—recognition is not the same as enforce- ment"). Here, the issue before the court is rec- ognition of the decisions by Saudi Arabian courts.

If a final judgment is reached first in the foreign court, it can then be pled as *res judicata* in the domestic court. *Scheiner v. Wallace,* 832 F.Supp. 687, 693 (S.D.N.Y.1993) (Sweet, J.) (citing *China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir.1987)).

Because this is a diversity action, the law of the forum with respect to comity should be applied. *British Midland Airways Ltd. v. Int'l Travel, Inc.,* 497 F.2d 869, 871 n. 2 (9th Cir.1974); *Pariente,* 771 F.Supp. at 615. New York law therefore determines the extent of the preclusive effect of the Saudi Arabian judgment. With certain exceptions, New York law provides that "a foreign country judgment that is final, conclusive and enforceable where rendered must be recognized and will be enforced as 'conclusive between the parties to the extent that it grants or denies recovery of a sum of money.' "[9] *Pariente,* 771 F.Supp. at 615 (quoting *In re Union Carbide Corporation Gas Plant Disaster at Bhopal,* 809 F.2d 195, 204 (2d Cir.), *cert. denied,* 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987)). Employing a liberal standard, New York courts presume that a foreign country judgment is valid "if that judgment, or the pleadings, shows that the court had jurisdiction over the action and is a court of general jurisdiction." *Pariente,* 771 F.Supp. at 615 (quoting 54 N.Y.Jur.2d, Enforcement and Execution of Judgments § 60, at 90 (1986)). As noted in the commentaries to the New York statute that governs foreign judgments, "[s]o liberal has New York case law been in the recognition of the judgments of foreign nations that the occasion for the use of Article 53 has been rare." Siegel, N.Y.C.P.L.R. § 5301 Practice Commentary, at 486 (McKinney's 1978); *Pariente,* 771 F.Supp. at 616. Here, the Saudi court had jurisdiction over the action before it; thus, this court can recognize the Saudi decisions. The court turns to whether those decisions have preclusive effect.

## A. Res Judicata

The doctrine of *res judicata* holds that "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981); *Saud v. Bank of New York,* 929 F.2d 916, 918 (2d Cir.1991). Under New York's "transactional approach" to *res judicata,* claims in a later action that arise out of the same "factual grouping" that formed the predicate for the prior proceeding are deemed to be part of the same "claim." The rationale of this approach is to prevent parties from splitting their claims among various jurisdictions. The court will bar such claims irrespective of whether they are based upon different legal theories or seek different relief. *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986) (citing *Smith v. Russell Sage College,* 54 N.Y.2d 185, 192–93, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746, 748–49 (1981)).

---

9. The Uniform Foreign Money Judgments Recognition Act, codified in Article 53 of New York's Civil Practice Law and Rules, at §§ 5301–5309, sets forth the grounds for recognition of foreign judgments that grant or deny recovery of a sum of money. Section 5304 sets forth the exceptions:

(a) A foreign country judgment is not conclusive if:
  1. the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;
  2. the foreign court did not have personal jurisdiction over the defendant.
(b) A foreign country judgment need not be recognized if:
  1. the foreign court did not have jurisdiction over the subject matter;

2. the defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;
3. the judgment was obtained by fraud;
4. the cause of action on which the judgment is based is repugnant to the public policy of this state;
5. the judgment conflicts with another final and conclusive judgment;
6. the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court; or
7. in the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action.

Canada Dry[10] argued that the October 24, 1995 decision by the Grievances Board of the Tenth Commercial Circuit of the Kingdom of Saudi Arabia precluded the current action. In that decision, the Saudi court denied Alesayi's claims, finding, *inter alia*, that Alesayi did not show that Canada Dry violated the contract nor that the alleged acts of Canada Dry caused Alesayi's damages. That decision, as both parties' declarants indicated, while valid, was not enforceable when the parties briefed the issue because Alesayi had filed an appeal within the 30–day appeals period. (Ltr. of 11/28/95 from Samuel D. Rosen to Hon. Robert L. Carter at 4). "A judgment shall become enforceable *if* the period allowed for appeal lapses without the losing party having appealed *or if* it has been confirmed by the appellate court within the Board of Grievances." (Decl. of Hassan Mahassni [for Canada Dry] at ¶ 6).[11] Since the parties' briefing, however, the appellate court has affirmed the Grievances Board decision; that decision is now final and enforceable. (Ltrs. of 4/19/96 and 5/3/96 from Robert E. Pokusa, counsel for Alesayi; Official Translation of the Stamp of the Fourth Circuit of the Grievances Board). For *res judicata* purposes, it is not material that the Saudi action was brought after Alesayi commenced the action presently before the court. *Chicago,*

*R.I. & P. Ry. Co. v. Schendel,* 270 U.S. 611, 46 S.Ct. 420, 70 L.Ed. 757 (1926); Restatement of Judgments § 43 (1980).

However, there are situations in which *res judicata* is not appropriate. These situations—exceptions to the rule against claim-splitting—are set forth in the Restatement (Second) Judgments, Section 26(1). Under Exception (c),[12] successive actions in various jurisdictions are allowed when a plaintiff is unable to seek relief in the first action because the court does not have subject matter jurisdiction. In this case, Alesayi initiated the New York action on claims arising from November, 1982 to February, 1991. Then Alesayi instituted the Saudi action to recover on claims covering the period of 1970 through October, 1982. Alesayi could not have sought recovery in this court on the Saudi claims because those claims were barred by even the most permissive of the relevant New York limitations bars.[13] Therefore, regardless of whether the claims before the Saudi court arose from the same factual grouping as the claims in the New York action, the Saudi decision does not have preclusive effect because the statute of limitations bar stripped this court of subject matter jurisdiction over the Saudi claims.[14] *Id.*

---

**10.** Because it is an affirmative defense, the party asserting *res judicata* bears the burden of proof that the doctrine is applicable. *Thomas v. New York City,* 814 F.Supp. 1139, 1148 (E.D.N.Y. 1993).

**11.** *See also* Report of Dr. Mohammad M.J. Nader (for Alesayi) ["Nader Report"] of Dec. 10, 1995, at 2 ("[A] judgement, rendered by the Grievance Board Commercial Circuit will only become final and enforceable if:

1. no party objects to the judgement of the commercial Circuit; [*or*]
2. the party that did not prevail fails to submit its appeals within the time period prescribed; *or*
3. the judgement is confirmed by the Appellate Circuit, or otherwise until a new judgment is issued according to the appeal procedure set forth above, qualifying the judgement be confirmed by the Appellate Circuit.)

(emphasis added).

**12.** Exception (c) provides:

The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple relief in a single action, and plaintiff desires in the second action to rely on that theory or seek that remedy or form of relief.

Restatement (Second) Judgments, § 26(1)(c) (1980).

**13.** *See* Section IV–A, in which the court discusses whether New York's four-year or six-year limitations periods apply to this action.

**14.** The fact that Alesayi could have brought the present New York action as part of its Saudi action—on claims arising from 1970 through February, 1991—suggests forum shopping, a practice long frowned upon. According to Restatement (Second) of Judgments § 26(1)(c) discussed above, however, Alesayi is allowed to have brought its claims in these two jurisdictions.

### B. Collateral Estoppel

■ Collateral estoppel ("issue preclusion") bars a party from relitigating matters determined adversely to him in a prior action.[15] The Second Circuit has held that in New York, collateral estoppel requires two levels of inquiry: (1) the court must determine if the issues are identical and the issues necessarily decided in the prior action are decisive in the present action; and, (2) the court must determine whether the party to be bound had a full and fair opportunity to contest the determination. *Conte v. Justice*, 996 F.2d 1398, 1400 (2d Cir.1993).

The party seeking the benefit of collateral estoppel bears the burden of proving that the issues resolved in a prior proceeding and those raised currently are identical. *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir. 1991); *Ryan v. New York Telephone Co.*, 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 827, 467 N.E.2d 487, 491 (1984). Issues are not identical when the standards governing them are significantly different. *Cullen v. Margiotta*, 811 F.2d 698, 732 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).

Here, there is evidence that the standards governing Alesayi's breach of contract claim in the Saudi action and the current action are significantly different—Alesayi need only prove its case by a preponderance of the evidence to this court while it had to meet a much higher, stricter standard before the Grievances Board.[16] Thus, on this inquiry alone, Canada Dry fails to show that collateral estoppel bars Alesayi's current claims.

Since neither *res judicata* nor collateral estoppel bars subject matter jurisdiction in this case, the court turns to a consideration of the claims—breach of contract arising

from defective and overaged extracts and breach of express and implied warranties—and the counterclaim—breach of contract arising from a violation of the Agreement's dilution of efforts clause—on their merits.

### III. Choice of Law

■ The License Agreement between Canada Dry and Alesayi provides that New York law governs the issues in this case; neither party contested the choice of law clause. *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 765 n. 1 (2d Cir.1986); (Joint Exh. 1 at 6). Under New York law, the plaintiff bears the burden of proving the material allegations of the complaint by a fair preponderance of the evidence. Canada Dry, as a counterclaim-plaintiff, bears the same burden on its counterclaim. *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F.Supp. 1188, 1195 (S.D.N.Y.1994) (Leisure, J.).

### IV. Breach of Contract

#### A. Statute of Limitations

■ By characterizing the Agreement as a contract for the sale of goods—the extracts—Canada Dry argued that the Uniform Commercial Code dictated the appropriate four-year limitations period. Alesayi asserted that the Agreement should be governed by the six-year statute of limitations for contracts under New York's C.P.L.R. § 213 because the Agreement was a contract for both goods and services.

■ Whether a contract is for the sale of goods or for services provided is a question of fact. *Farm Automation Corp. v. Senter*, 84 A.D.2d 757, 443 N.Y.S.2d 765, 765 (1981). In determining whether the violation of a contract providing both for the sale of

---

**15.** The New York courts which have given preclusive effect to foreign country judgments have generally not specified the source of the applicable law. *See e.g., In re Zietz' Estates*, 207 Misc. 22, 135 N.Y.S.2d 573, 577–78 (Surr.Ct.1954), *aff'd*, 285 App.Div. 1147, 143 N.Y.S.2d 602 (2d Dep't 1955); *Newton v. Hunt*, 59 Misc. 633, 112 N.Y.S. 573, 574–75 (1908), *modified*, 201 N.Y. 599, 95 N.E. 1134 (1911).

**16.** The plaintiff in an action before the Grievances Board bears a burden of proof that exceeds the United States' "preponderance of the

evidence" standard, and is most analogous to the "beyond a reasonable doubt" standard used in United States' criminal courts. (Nader Report, at 3). In addition, the parties in an action before the Grievances Board do not take discovery or depositions and no documents are exchanged. Another striking difference between that action and one in the United States is that there is no way to compel testimony from adverse witnesses, nor does the Grievances Board have rules concerning the admissibility of evidence.

goods and for the furnishing of services is controlled by the four-year statute of limitations of U.C.C. § 2–725 (McKinney's 1993) or the six-year statute of limitations in N.Y.C.P.L.R. § 213(2), the test is whether the contract is "predominantly" one for the sale of goods or for the providing of services. *Levin v. Hoffman Fuel Co.,* 94 A.D.2d 640, 462 N.Y.S.2d 195, 196, *aff'd,* 60 N.Y.2d 665, 468 N.Y.S.2d 104, 455 N.E.2d 663 (1983). If the provision of services or rendering of other performance predominates and is not merely incidental or collateral to the sale of goods, then the U.C.C. does not apply. *Compania Sud–Americana de Vapores v. IBJ Schroder Bank & Trust,* 785 F.Supp. 411, 431 n. 19 (S.D.N.Y.1992) (Kram, J.). This inquiry depends heavily on the facts and terms peculiar to that contract. *McNally Wellman Co. v. New York State Electric & Gas Co.,* 63 F.3d 1188, 1194 (2d Cir.1995) (resting the determination of the applicable statute of limitations period on the essential terms and consequences of the contract); *see also Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.,* 696 F.Supp. 57, 85 (D.Del. 1988) (discussing cases in which courts have alternatively found actions involving franchises, distributorships, or other "mixed" goods and services contracts as both outside and within the U.C.C. for statute of limitations purposes), *aff'd in part and rev'd in part on other grounds,* 988 F.2d 386 (3d Cir.1993), *cert. denied,* 510 U.S. 908, 114 S.Ct. 289, 126 L.Ed.2d 239 (1993).

█ The court finds that while the contract provides for the sale of extracts, it also provides for services that were not incidental to the sale of goods. Specifically, Article 7 of the Agreement indicates that the purpose behind the agreement was the establishment of a bottling business by Alesayi, not just the sale of extracts from Canada Dry to Alesayi:

The Bottler agrees to establish and commence operation of a plant for the production of "CANADA DRY" beverages, at Bottler's expense no later than July 31, 1969.... *When the demand for "CANADA DRY" beverages in the territory shall necessitate additional facilities, the Bottler agrees to establish such additional facilities.*

Article 7, License Agreement (emphasis added).[17] Furthermore, Shabb testified that the Agreement contemplated other activities beyond the sale of extract. (Tr. at 134). After carefully evaluating the Agreement in its entirety, the court finds that the sale of extracts did not predominate and therefore the breach of contract action is subject to the six-year statute of limitations under New York's C.P.L.R. § 213(2). Because Alesayi and Canada Dry entered into an agreement to toll the statute of limitations as of November 1, 1988, Alesayi may recover on claims for damages accruing from November 1, 1982.[18]

**B. Standards For Breach of Contract**

█ A party seeking recovery for breach of contract must show: (1) a contract; (2) performance by the party seeking recovery; (3) breach of the contract by the other party; and (4) damages attributable to the breach. *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522 (2d Cir.1994). When a party materially breaches, it has failed to substantially perform the contract and the other party is discharged from performing its obligations. *Jafari v. Wally Findlay Galleries,* 741 F.Supp. 64, 68 (S.D.N.Y.1990) (Sweet, J.).

█ The power to terminate a contract following breach is one of election. *Bigda v. Fischbach Corp.,* 849 F.Supp. 895, 901 (S.D.N.Y.1994) (Carter, J.). The non-breaching party faces two options: it may either continue to perform under the contract

17. In addition, Article 8, in part, provides:
... The Bottler shall service and develop sales of "CANADA DRY" beverages throughout the entire territory.
Article 9, in part, provides:
The Bottler agrees to advertise "CANADA DRY" beverages in all parts of the licensed territory and shall expend for such advertising an amount adequate to promote properly the sale of "CANADA DRY" beverages therein. Canada Dry shall have absolute control over

all advertising of "CANADA DRY" beverages and its decisions with respect thereto shall be conclusive. All advertising material and copy therefore must meet with Canada Dry's approval.

18. Whether a contract is governed by New York's U.C.C. or C.P.L.R., the plaintiff's cause of action accrues when the breach occurs. *Long Island Lighting Co. v. General Electric Co.,* 712 F.Supp. 292, 299 (E.D.N.Y.1989).

or it may terminate the contract. *Id.* If the non-breaching party elects to continue performance, it may not later choose to terminate the contract on account of the breach. *Id.* However, the non-breaching party may later sue for breach, even though it elected to continue to perform rather than terminate the agreement, if notice of the breach was given to the breaching party. *Nat'l Westminster Bank v. Ross,* 130 B.R. 656, 675 (S.D.N.Y.1991) (Kram, J.), *aff'd sub nom, Yaeger v. Nat'l Westminster,* 962 F.2d 1 (2d Cir.1992).

### C. The Alleged Breaches

At trial, Alesayi claimed that the market rejected its Canada Dry orange soda as off-taste and off-color because Canada Dry sold Alesayi defective orange extracts and knowingly labelled the extracts with incorrect expiration dates—two acts that constituted a breach of the License Agreement. As a result, Alesayi suffered a loss of profits and loss of value in its business as a going concern. However, Canada Dry contested whether Alesayi satisfied the second element of its breach of contract claim—that Alesayi faithfully performed its contract obligations. To the contrary, Canada Dry argued, Alesayi breached the Agreement by violating the dilution of efforts provision of Article 10 and that Alesayi therefore cannot recover.[19]

### 1. Article 10—Dilution of Efforts

Canada Dry alleged that when Alesayi began to bottle and sell Fifa products in late

19. This argument also comprises the basis of Canada Dry's counterclaim: that Alesayi breached the Agreement by selling Fifa products in direct competition with its Canada Dry products. As a result, sales of Canada Dry beverages declined sharply until Canada Dry ultimately lost its entire market in the Western Region. Canada Dry claimed that it was unable to establish a new bottler until 1992 and seeks lost profits as damages.

20. Alesayi pointed to the opinion from Canada Dry's legal department that "the License Agreement for [Alesayi] does not provide a legal mechanism to prevent our bottler from producing product for third parties without our written approval." (PX 301A).

21. Alesayi referred to the fact that its delivery trucks delivered Fifa products on 100 out of 12,000 occasions from 1984 to the end of 1985 as having *de minimis* significance.

1984, Alesayi violated Article 10 of the License Agreement. Alesayi responded that Article 10 did not prohibit the contract bottling of other beverages; rather, it only prohibited the distribution and sale of other beverages that would dilute or tend to dilute Alesayi's efforts on behalf of Canada Dry.[20] Alesayi also challenged Canada Dry's evidence of dilution and Canada Dry's assertion that Alesayi's *de minimis* efforts [21] on behalf of Fifa—while in contravention to the parties' agreement signed on November 14, 1984—rose to the level of a material breach.

Article 10 provides:

The Bottler agrees to devote all of its efforts to the promotion of sales of "CANADA DRY" beverages in the territory, and the Bottler shall not engage in any undertaking, or sell or distribute any beverages other than "CANADA DRY" which shall dilute or tend to dilute the Bottler's effort. Compliance by Bottler with the provisions of this article constitutes a material consideration to Canada Dry in granting this agreement.

On its face, Article 10 is unambiguous. Furthermore, Alesayi's *de minimis* argument fails to rebut the clear meaning of Article 10: that breach of this provision is considered material. The question, therefore, is whether Alesayi's involvement with Fifa diluted or tended to dilute Alesayi's efforts on behalf of Canada Dry.[22]

22. At trial, Canada Dry argued that Alesayi's Fifa sales and activity were a *per se* violation of Article 10. The court rejects this argument. The language of Article 10 does not indicate that sales of another product violates the clause; rather, a violation occurs only if sales of another product diluted or tended to dilute the bottler's Canada Dry efforts. To support this conclusion, Alesayi presented evidence that Canada Dry inconsistently enforced Article 10 and thereby allowed other bottlers to engage in non-Canada Dry activity that arguably diluted the bottlers' Canada Dry efforts. Canada Dry's contracts with bottlers in Cyprus and Damascus contained the exact same Article 10 provision with typewritten addenda allowing the bottlers *to bottle,* not to sell, other soda brands. Canada Dry contended that these contracts supported its position that it only allowed non-Canada Dry activity if the contracts explicitly allowed it. However, the court found Canada Dry's testimony on this point

Alesayi began to bottle and distribute Fifa products in mid–1984 which included orange, lemon, cola, and fruit-flavored beverages. (DX 1S and DX 5G—Alesayi's driver record of 9/27/84 indicating quantity in cases of Fifa and Canada Dry beverages sold and unsold for that day). By October, 1984, Canada Dry had observed that Fifa trucks left and returned to Alesayi's premises; that the Fifa sales force was located on Alesayi's premises; that the telephone number given to the public for Fifa was the same as Alesayi's; that the name of Alesayi Beverage Corp. appeared on the Fifa beverage bottles; and that Alesayi's management was actively involved in marketing Fifa's products. (DX 1U—Telex of 10/01/84 from Shabb to Alesayi). Concerned that the Fifa products and Fifa activity were in direct competition with Canada Dry's orange, lemon-lime, and cola soft drinks, Canada Dry informed Alesayi that Alesayi was in breach of the Agreement. *Id.* Canada Dry refuted Alesayi's contention that Fifa was a separate legal entity and accused Alesayi of using its management, distribution and sales to promote the Fifa products.

However, because both parties expressed the desire to continue the relationship, Canada Dry agreed in November, 1984 to let Alesayi manufacture Fifa products and to sell them to Fifa if Alesayi relocated all sales, distribution, marketing and activities other than manufacturing relating to Fifa away from Alesayi's bottling plant and from Alesayi's sales and distribution personnel. (DX 1Y; Tr. at 361). One year later, in October, 1985, Canada Dry informed Alesayi that Alesayi was in breach of the November, 1984 agreement because Alesayi resumed selling Fifa from the Alesayi premises and Alesayi was again mixing the Fifa line with Canada Dry products. Canada Dry once again invoked Article 13 and gave Alesayi 30 days to move the Fifa operation from Alesayi's prem-

ises. (DX 2K—Telex of 10/29/85 from Shabb to Alesayi).

By entering into the November, 1984 agreement with Alesayi, Canada Dry forgave any breach by Alesayi that might have occurred prior to the date of that agreement. *See e.g., Bigda,* 849 F.Supp. at 901. Any Fifa activity occurring after that agreement that diluted or tended to dilute Alesayi's Canada Dry efforts, however, may be considered a breach. Canada Dry has not waived its breach claim for the post-November, 1984 activity, even though it continued to perform under the Agreement, because Canada Dry gave Alesayi notice of the alleged breach in the October, 1985 telex. *Nat'l Westminster Bank,* 130 B.R. at 675. Therefore, the court considers whether Alesayi's Fifa activity from October, 1985 until December 7, 1987—the date from which both parties behaved as if the contract had been terminated—constituted a breach of the Agreement.

Canada Dry presented persuasive evidence on this point. Canada Dry's expert in the beverage industry testified as to the causative effect of Alesayi's Fifa activity on Canada Dry's declining sales. He testified that Alesayi induced distributors to buy Fifa over Canada Dry products by pricing the Fifa line at similar or slightly lower levels than the Canada Dry line. The important wholesale distributors were also given substantially larger discounts on Fifa beverages than the quoted discounts on Canada Dry products. (DX 6X at 5—Report of Michael C. Bellas).

The expert also concluded that because Alesayi shifted some of its warehouse, delivery, and sales personnel to the Fifa brand—where they were often instructed to give preference to the Fifa products over the Canada Dry line—Alesayi's marketing and sales efforts on behalf of Canada Dry were significantly curtailed. Furthermore, Alesayi converted some of its trucks to exclusive Fifa delivery. These trucks no longer bore the Canada Dry logo but the Fifa logo and de-

unpersuasive; Canada Dry's Vice–President for the Middle East, Shabb, testified that the Cyprus and Damascus amendments' explicit permission *to bottle* non-Canada Dry products also included an implicit authorization *to sell or distribute* the non-Canada Dry products.

The court also rejects Canada Dry's argument that Alesayi's breach of the November 14, 1984 agreement was a *per se* violation of Article 10; unless Alesayi's activities that constituted the breach of that agreement diluted or tended to dilute Alesayi's Canada Dry efforts, there was no breach of Article 10.

cals. *Id.* Consequently, the market's attention was split between Canada Dry and Fifa; indeed, Alesayi actively encouraged the market to consider and try Fifa. The expert concluded that the strong performance of Fifa beverages in the marketplace—during which Fifa sales represented almost 63.1 percent of Alesayi's total sales in 1986—came at the expense of Canada Dry products. *Id.* at 6.[23]

Alesayi rebutted Canada Dry's allegation and claimed that by the time it began to bottle for Fifa, the market demand for Canada Dry products had already begun to decline. It was precisely this market rejection of Canada Dry,[24] which left Alesayi with a high level of excess production and distribution capacity, that caused Alesayi to expend its *de minimis* Fifa efforts. Therefore, Alesayi contended, it committed no dilution of efforts.

However, both parties' data indicated that Alesayi's sales were significantly higher in 1982 through 1984—the period during which the market allegedly rejected Canada Dry products—than in previous years. (PX 958; DX 6J). Alesayi contended that the increased sales were due to the introduction of soft drinks sold in cans. But if the market was rejecting Canada Dry because it was off-taste and off-color, it is logical that the market would have rejected the same poor quality soda even if it were suddenly sold in a can.[25] Therefore, Alesayi has failed to reconcile its market rejection theory with data indicating that its sales of an allegedly substandard product had increased.

The court finds that Alesayi breached Article 10, the dilution of efforts clause, because its post-November, 1984 Fifa activity diluted its efforts on behalf of Canada Dry.

Both parties agree that the following legal principle applies to this case: a party who has committed a material breach first cannot claim a subsequent breach by the other party. (Pl.'s Post–Trial Memo. at 2; Def. and Countercl. Pl.'s Proposed Findings of Fact and Conclusions of Law at ¶ 50). Since the court finds that Alesayi breached Article 10, Alesayi's claim that Canada Dry breached the Agreement can no longer stand. Moreover, even though Alesayi claimed that Canada Dry's alleged breach occurred prior to its dilutive Fifa-related activity, Alesayi waived its opportunity to assert a breach of contract claim because it continued to perform under and accept the benefits of the contract until 1987. *See Nat'l Westminster Bank v. Ross,* 130 B.R. at 675. Therefore, the court dismisses Alesayi's breach of contract claim arising from defective and overaged extracts and its breach of express and implied warranties claim.

## V. Damages

Under New York law, the recovery of lost profits as damages is subject to the following stringent requirements: (1) it must be demonstrated with certainty that the damages were caused by the breach, (2) the alleged loss must be capable of proof with reasonable certainty, and (3) there must be a showing that the damages were fairly within the contemplation of the parties to the contract at the time it was made. *Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1577 (2d Cir.1994) (quoting *Kenford Co. v. County of Erie,* 67 N.Y.2d 257,

**23.** In further support of its claim, Canada Dry also submitted driver records indicating that both Fifa and Canada Dry beverages were distributed by Alesayi up through November, 1987. (DX 5N).

**24.** Even though Alesayi's action focused on defective and overaged orange extract and a poor quality finished orange beverage, Alesayi contended that its Canada Dry sales were affected by a "reverse halo effect." Under this market phenomenon, the market's negative reaction to Canada Dry's orange soda tainted the market's judgment towards the other Canada Dry flavors so that Alesayi's sales of all of the Canada Dry beverages declined.

**25.** Even if consumers could no longer see that the soda was off-color, or even if the metal cans prevented direct sunlight from discoloring the soda as may have occurred when the sodas were sold in glass bottles, the cans would not have solved the off-taste problems. Indeed, by seeking damages through to a date that is later than 1982—when cans were introduced into the market—Alesayi admits that the poor quality finished product continued to be a problem after 1982. Accordingly, Alesayi's sales should not have continued to increase.

502 N.Y.S.2d 131, 493 N.E.2d 234 (1986) (per curiam)).

Canada Dry has shown that any damages it suffered was due to Alesayi's breach. Alesayi's efforts to market Fifa were at the expense of Canada Dry's sales and foothold in the market. *See* discussion at Sec. IV–C–1, *supra;* DX 6Y. Canada Dry could not prevail upon another bottler to sell its products in that market because it had given Alesayi an exclusive license to bottle and sell Canada Dry in the Western Region of Saudi Arabia. *See* Joint Exh. 1 at 1, Art. 1. As long as Canada Dry and Alesayi were parties to that exclusive agreement, Canada Dry's market share was tied to Alesayi's efforts.

Regarding the second element, Canada Dry maintained that its lost profits calculations were reasonably certain and accepted under Second Circuit caselaw. Alesayi claimed the calculations were legally impermissible because Canada Dry's calculations actually projected lost gross profits rather than lost net profits.

It is well settled that the general rule for measuring damages for breach of contract is the amount necessary to put the non-breaching party in the same economic position it would have been in had the breaching party fulfilled the contract. *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 495 (2d Cir. 1995). Proof of lost profits is one method of proving the amount necessary to restore a plaintiff to the economic position it would have been in absent the breach. *Id.* However, any revenues due to the non-breaching party must be offset by any amount that the non-breaching party saved as a result of the breach. Included in this offset is variable costs, or the costs that would have been incurred by the non-breaching party if there had been performance under the contract. *Id.*

Alesayi correctly stated the law concerning lost profits; however, Canada Dry's calculations were in fact lost net, not gross, profits. Alesayi seems to have mischaracterized Canada Dry's calculations because Canada Dry used a gross profit margin figure, rather than a net profit margin figure, to account for the estimated manufacturing costs attributable to Canada Dry. *See* Tr. at 954. The resulting figure was not a lost gross profit, however, but rather lost profits derived from estimated gross revenues less estimated manufacturing and advertising costs. *See* Tr. at 903–04, 919, 922–26. As explained more fully below, the use of a gross profit margin figure in this instance does not render Canada Dry's lost profits methodology legally impermissible.

As its starting point, Canada Dry calculated the gross revenues per year it would have received, absent breach by Alesayi. To get this figure, Canada Dry multiplied its projected market share by the amount of soft drinks in liters consumed by the Saudi Arabian market for each year after the breach.[26] (DX 6Y, Exh. 12). Canada Dry then subtracted any actual sales by Alesayi for that year to derive the lost sales for that year. Canada Dry then multiplied the 1983 price per liter of beverage produced from the extract sold to Alesayi by the lost sales figure for each year at issue. (DX 6Y at 6). The resulting figure was the lost revenue for each year. (DX 6Y, Exh. 12).

Next, Canada Dry derived the lost profits for each year by multiplying the lost revenue for each year by the gross profit margin (a percentage figure that reflected how much of

**26.** To derive Alesayi's market share percentage for a given year, Canada Dry divided the number of cases of soft drinks sold by Alesayi for that year by the number of cases consumed in Saudi Arabia in that year. For the years from 1980 through 1984, Alesayi's market share ranged from 1.77 percent to 2.83 percent of the total cases of soft drinks consumed. Canada Dry averaged the market share percentages for these five years and used that number, 2.31 percent, where relevant in its calculations. (DX 6Y at Exh. 5; Tr. at 904–05).

Contrary to Alesayi's contention, however, Canada Dry did not enhance its damages calculations by using market consumption figures for the whole country, rather than the figures corresponding exactly to Alesayi's sales region within Saudi Arabia, to compute Alesayi's market share percentage. In fact, using a larger sales region, and therefore a larger quantity of cases sold, resulted in a lower market share percentage. If Canada Dry had used the smaller region, and thus a smaller quantity of cases sold, Alesayi's market share percentage would have been larger and therefore its lost profits calculation greater.

the revenue was profit and how much was manufacturing costs). (DX 6Y, Exh. 12). Then Canada Dry subtracted advertising costs equal to 1.7 percent of Alesayi's lost sales for that year.[27] The final figure was the lost profits for the given year.

■ In sum, then, from the gross revenues Canada Dry would have received from sales of extracts to Alesayi absent breach, Canada Dry subtracted variable costs: the cost to manufacture the extract sold to Alesayi and the advertising costs Canada Dry would have incurred under the Agreement. The Second Circuit has held this method to be the proper formula for deriving lost profits. *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 92–93 (2d Cir.1984) ("the proper formula ... for lost ... profits [is] the revenues he would have received from the [contracted-for activity] minus the additional costs he would have incurred in handling [the contracted-for activity]"); *see also Record Club of America v. United Artists Records, Inc.*, 696 F.Supp. 940, 946–47 (S.D.N.Y.1988). While damages for lost profits must be capable of proof with reasonable certainty, absolute certainty is not required. Such damages must be capable of measurement based upon known reliable factors without undue speculation. *Campbell v. Rogers & Wells*, 218 A.D.2d 576, 631 N.Y.S.2d 6, 10 (1995). Canada Dry's methodology demonstrated reasonable certainty in providing a basis for calculating lost profits.

Moreover, Alesayi has not given any indication that there were more costs that Cana-

da Dry should have deducted in order to properly compute lost profits.[28] Instead, Alesayi argued in a conclusory manner that the use of a gross profit margin resulted in a lost gross profits computation.

Alesayi also challenged the actual gross profit margin figure used by Canada Dry as unreliable. Canada Dry asserted that sales of extract to Alesayi resulted in a gross profit margin of 75 percent. Canada Dry's damages expert received this figure from Canada Dry personnel and its beverage industry expert testified that this figure was reasonable. (Tr. at 1090–91). However, Canada Dry's damages expert calculated that Alesayi's gross profit margin was only 7.5 percent.[29] Without more, it does not make sense that Canada Dry's gross profit margin could be ten times greater than Alesayi's margin. Thus, the court will reduce this figure to 50 percent.

Lastly, Canada Dry satisfied the third requirement for lost profits because lost profits comprise a form of damages likely to flow from breach of an agreement that concerned trademark privileges, a licensed bottling facility, and extract sales. Moreover, the Agreement specifically allows "the party claiming the breach [to] pursu[e] any ... legal remedies [other than termination] which it may have for such breach or which may have otherwise accrued under the agreement." (Joint Exh. 1 at 5, Art. 15). Therefore, the parties clearly contemplated this form of liability at the time of contract-

**27.** Canada Dry's expert used the amounts budgeted from 1980 through 1985 by Alesayi (usually 65 percent of a planned amount of advertising) and Canada Dry (usually the remaining 35 percent of the advertising budget) to calculate the amounts budgeted as a percentage of Alesayi's actual sales of finished product in liters. The expert then multiplied this ratio, an averaged figure of 1.7 percent, by the lost sales measured in liters to derive the advertising costs that Canada Dry would have expended for each year of lost sales.

**28.** During Alesayi's cross-examination of Canada Dry's damages expert, Alesayi's counsel asked whether the expert subtracted amortization or depreciation on the manufacturing equipment, depreciation on the building, the costs of running the Beirut supervisory operation, the general overhead allocations such as insurance, the gen-

eral costs of doing business, various employee-related insurance costs, and other expenses in computing the gross profit margin. This inquiry, however, focused on the reliability of Canada Dry's gross margin figure, not on the costs that should be subtracted when computing lost net profits. (Tr. at 955–58). Furthermore, some of these costs may be considered fixed costs. Courts only subtract fixed costs when calculating lost profits due to a breach that ends an ongoing business. *Indu Craft*, 47 F.3d at 495.

**29.** Canada Dry's expert calculated the 7.5 percent gross profit margin figure as part of a trademark infringement claim that Canada Dry did not bring at trial. (DX 6Y at 8 and Exh. 10). Alesayi discussed this computation for the purposes of rebutting the credibility of the expert's calculations. (Tr. at 976).

ing. Alesayi did not refute the satisfaction of this requirement.

Canada Dry is entitled to damages calculated as follows:

| | 1985 | 1986 | 1987 |
|---|---|---|---|
| market consumption (in mil. liters) | 512 | 484 | 532 |
| Alesayi Market Share (at 2.3%) | 11.78 | 11.13 | 12.24 |
| less: sales by Alesayi | −9.10 | −2.30 | 0 |
| Lost Sales: | 2.68 | 8.83 | 12.24 |
| Lost Revenues [30] in $U.S. thousands (at 4.8 cents per liter) | 128.64 | 423.84 | 587.52 |
| Gross Profit Margin (at 50%) | 64.32 | 211.92 | 293.76 |
| less: Advertising (at 1.7% of actual Alesayi sales) | 0 | −150.11 | −208.01 |
| **LOST PROFITS** | 10.72 [31] | 61.81 | 85.75 |

TOTAL: $158,280.00

■ Canada Dry also sought incidental costs associated with its reentry into the market after Alesayi's breach. Canada Dry claimed that it could not find another bottler for the Western Region of Saudi Arabia until 1992 and sought damages for 1992 through 1994. (DX 6Y at 9 and Exh. 11). These incidental costs comprised the advertising expense purportedly incurred by Canada Dry to snag consumer attention after an alleged five year absence of its soft drinks. The court finds, however, that Canada Dry is not entitled to these costs because the Saudi market was not devoid of Canada Dry products or advertising; its beverages were sold in the Eastern Region and other regions of Saudi Arabia. Canada Dry has not put forth a sufficient basis for these costs especially since lost profits constitute damages sufficient to restore Canada Dry to the economic

position it would have been in absent Alesayi's breach. *See e.g., Indu Craft, Inc.*, 47 F.3d at 495.

## VI. Conclusion

Alesayi cannot recover on its breach of contract claim because Canada Dry has shown that Alesayi breached the License Agreement. Canada Dry is therefore entitled to damages on its counterclaim of $158,-280.00.

**IT IS SO ORDERED.**

---

**30.** In doing the previous calculations (i.e., market consumption multiplied by market share less sales) to derive the lost revenues for 1985, 1986 and 1987, the court's figures for lost revenues, and consequently the remaining figures, differ slightly from Canada Dry's figures. Although, the court accepts Canada Dry's methodology, the court relies on its own computations to derive the lost profits owed to Canada Dry.

**31.** The final lost profits figure for 1985 represents only two months of lost profits in 1985 because Canada Dry gave notice of the breach on October 25, 1985. Thus, Canada Dry is only entitled to damages for November and December of 1985 which is one-sixth of the lost profits calculation for 1985.