Abdulaziz A. ALFADDA; Abdullah Abbar; Abdulla Kanoo; Abdulaziz Kanoo; Yusif Bin Ahmed Kanoo (a Partnership Company); and Ahmed A. Zainy, Plaintiffs,

v.

Richard A. FENN; Jamal Radwan; Saudi European Investment Corporation N.V.; Saudi European Bank, S.A.; Alef Investment Corporation N.V.; Alef Bank, S.A.; Societe d'Analyses et d'Etudes Bretonneau; and Societe de Banque Privee (S.B.P.), Defendants.

Abdulrahman A. AL–TURKI, Abdulrahman H. Sharbatly, Abdullatif A. Alissa, AND Saad A. Alissa, Plaintiffs,

v.

Richard A. FENN; Jamal Radwan; Saudi European Investment Corporation N.V.; Saudi European Bank, S.A.; Alef Investment Corporation N.V.; Alef Bank, S.A.; Societe d'Analyses et d'Etudes Bretonneau; and Societe de Banque Privee (S.B.P.), Defendants.

Nos. 89 Civil 6217 (LMM),
90 Civil 4470 (LMM).

United States District Court,
S.D. New York.

June 11, 1997.

John M. Aerni, Leboeuf, Lamb, Greene & MacRae, L.L.P., New York City, Jeffrey R. Parsons, Beirne, Maynard & Parsons, L.L.P., Houston, TX, for Plaintiffs.

Frank H. Wohl, Lankler, Siffert & Wohl, New York City, for Société de Banque.

Robert Ted Parker, Berg, Ziegler, Anderson & Parker, San Francisco, CA, for Société d'Analyses et d'Etudes Bretonneau.

David R. Jewell, Donovan, Leisure, Newton & Irvine, New York City, for Saudi European Inv. Corporation, N.V., Alef Inv. Corp., N.V., Alef Bank, S.A., Jamal Radwan.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiffs in these consolidated actions (*see* Memorandum and Order, dated February 21, 1992, at 9.), all foreign nationals who reside in Saudi Arabia, commenced the instant actions because of injuries allegedly incurred as a result of their investment in defendant Saudi European Investment Corporation N.V. ("SEIC"), a Netherlands Antilles corporation. Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968; Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and state law.

Defendants SEIC, Alef Investment Corporation N.V. ("AIC"), Alef Bank, S.A. ("Alef Bank"), and Jamal Radwan ("Radwan") (collectively these defendants will be referred to as the "SEIC defendants") move: (1) for summary judgment dismissing all the claims against them in *Al–Turki v. Fenn* (90 Civ. 4470) (the "*Al–Turki* action") on the ground that the doctrine of issue preclusion bars relitigation of facts resolved by a previous French judgment; and (2) for dismissal of both the *Al–Turki* action and *Alfalfa v. Fenn* (89 Civ. 6217) (the "*Alfadda* action") on the ground of forum non conveniens. Defendant Societe de Banque Privee (S.B.P.) ("SBP") moves for dismissal of the claims against it in both the *Al–Turki* and *Alfadda* actions on

the grounds that: (1) the Court lacks subject matter jurisdiction over plaintiffs' allegations against SBP; and (2) the doctrine of forum non conveniens.

For the reasons set forth below, the Second Amended Complaint in the *Al–Turki* action and the Third Amended Complaint in the *Alfadda* action are dismissed.[1]

## FACTUAL BACKGROUND

All the plaintiffs are foreign nationals residing in Saudi Arabia. (Alfadda Compl. ¶¶ 5–8; Al–Turki Compl. ¶¶ 5–8.)[2]

■ Radwan, the only individual defendant, is a United States citizen who resides abroad, apparently in France.[3] (Alfadda Compl. ¶ 11; Al–Turki Compl. ¶ 11; Radwan Decl., 10–21–96, ¶ 2; Jewell Aff., 10–30–96, Ex. H, at 2.) At all relevant times, Radwan was the chairman of SEIC and AIC, holding companies organized under the laws of the Netherlands Antilles. (Alfadda Compl. ¶¶ 16, 24; Al–Turki Compl. ¶¶ 16, 24; Jewell Aff., 10–30–96, Ex. D, at 2, 4, 7; Radwan Decl., 10–21–96, ¶ 1.)

Saudi European Bank, S.A. ("SE Bank"), a grandchild subsidiary of SEIC, and Alef Bank, a subsidiary of AIC, were French banks registered to do business in New York. (Alfadda Compl. ¶¶ 17, 25; Al–Turki Compl. ¶¶ 17, 25; Jewell Aff., 10–30–96, Ex. D, at 4.) Radwan was the chairman of SE Bank until 1989, when the bank was sold. (SE Bank 1983 Annual Report; Radwan Dep. 32.) SBP is also a French bank. (Alfadda Compl. ¶ 19; Al–Turki Compl. ¶ 19; Fonlupt Decl., 2–12–96, ¶ 2.) The only known address of Societe d'Analyses et d'Etudes Bretonneau ("Bretonneau") is in France. (Alfadda Compl. ¶ 18; Al–Turki Compl. ¶ 18.)

The nine-count complaints of the *Alfadda* and *Al–Turki* actions are substantially identical. In an earlier Memorandum and Order, the Court ordered separate trials for Counts I–VI and Counts VII–IX of the complaints. *Alfadda v. Fenn*, 1993 WL 526065 (S.D.N.Y. 1993). Counts I–VI include claims against all the defendants, and generally relate to alleged securities fraud violations perpetrated in 1984. Counts VII–IX include claims against Bretonneau and SBP only, and generally relate to the 1989 sale and reorganization of SE Bank.

### I. Counts I–VI

The focus of plaintiffs' securities fraud and related claims concerns the 1984 offering of SEIC stock (the "1984 offering"). In conjunction with the 1984 offering, SEIC issued a prospectus entitled "Confidential Private Placement Memorandum" ("PPM"), dated January 5, 1984. Plaintiffs contend that the SEIC defendants, among others: (1) made material misrepresentations and omissions in the PPM regarding SEIC's financial condition and performance; (2) deliberately diluted plaintiffs' ownership interest in SEIC by issuing more than the 600,000 voting shares represented in the PPM; (3) charged plaintiffs an undisclosed premium for their shares, contrary to representations in the PPM; (4) diverted the proceeds from the 1984 offering to their own personal and fraudulent ends; and (5) concealed their fraudulent conduct.

### A. The Unitel Loan

Plaintiffs contend that, in 1982, Radwan, Abdulhadi Taher, a foreign national and former director of SE Bank, and other defendants including SE Bank, AIC, and Alef Bank engaged in a series of sham loans to manipulate the financial condition of SEIC and SE Bank. Specifically, plaintiffs allege that in March 1982, SE Bank loaned Unitel,

---

1. The Third Amended Complaint in the *Alfadda* action and the Second Amended Complaint in the *Al–Turki* action will be referred to respectively as the Alfadda and Al–Turki complaints. Pending motions not resolved by this Memorandum and Order are denied as moot.

2. Plaintiffs Yusif Bin Ahmed Kanoo (a partnership company), Abdulla Kanoo, and Abdulaziz Kanoo will be referred to collectively as "Kanoo."

3. Because Radwan is apparently a "stateless" citizen, he cannot be a party to a federal action based on diversity of citizenship. *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 829, 109 S.Ct. 2218, 2221, 104 L.Ed.2d 893 (recognizing that party's "stateless" status destroyed diversity under 28 U.S.C. § 1332(a)(3), and his United States citizenship destroyed diversity under § 1332(a)(2)). The actions have been voluntarily dismissed as to Richard A. Fenn. (Jewell Aff., 10–30–96, Ex. C.)

an entity controlled by Taher, $11 million at 17% interest with a drawdown date of March 17, 1982. On March 17, 1982, Unitel loaned $11 million to SEIC at 17.5% interest. Thereafter, SEIC loaned the $11 million to certain affiliates, which loaned the $11 million back to SE Bank. Plaintiffs contend that these loans artificially inflated the financials of SE Bank and SEIC's return on capital to its shareholders, which were fraudulently incorporated into the PPM. (Alfadda Compl. ¶ 36; Al–Turki Compl. ¶ 33.)

## B. The Sale of SEIC Stock

SEIC's original "Deed of Incorporation" authorized it to issue 40,000 voting shares of SEIC stock. In SEIC's original stock offering, it issued 20,000 of the authorized shares at $1,000 per share. In July 1979, Alfadda, an original shareholder of SEIC, paid $1 million for 1,000 voting shares of SEIC, which constituted 5% of the original voting shares issued, plus a $50,000 organization fee. (Alfadda Compl. ¶¶ 9, 33; Alfadda Decl., 6–12–90, ¶ 2.) SEIC represented to Alfadda that, as an original shareholder, he would receive a preference to purchase SEIC stock in subsequent offerings.

Around October 1983, SEIC planned the 1984 offering. SEIC engaged Ronald Reilly and his company, Capital International, Inc., a Texas corporation, to, among other things, help promote the 1984 offering to prospective investors. (Wohl Aff., 5–3–96, Ex. 27.) Reilly prepared the PPM on behalf of SEIC primarily in Paris. (Reilly Dep. 11.) Radwan agreed to have SE Bank act as both the paying agent and United States transfer agent for funds received from the 1984 offering. (Radwan Dep. 1404–05, 1484.) SE Bank used its account at European American Banking Corporation in New York City as the primary account for the deposit of sub-scription funds. (Alfadda Compl. ¶ 53; Al–Turki Compl. ¶ 52.) Alef Bank acted as the managing underwriter for the 1984 offering. (Jewell Aff., 10–30–96, Ex. D, at 1.)

Around the time of the 1984 offering, the original shares sold were split 30 for 1, creating 1.2 million authorized and 600,000 issued shares. The prospectus for the 1984 offering stated that another 600,000 voting shares (equal to 20,000 original shares split 30 for 1) were to be sold at $100 per share. In the event of an oversubscription, up to 1.8 million non-voting shares were to be issued. Subscribers to the 1984 offering were offered a "pre-emptive right to new share issues in order to maintain or increase their percentage of ownership in the company." [4] (Jewell Aff., 10–30–96, Ex. D, at 11.)

Plaintiffs contend that defendants did not disclose that the 20,000 originally authorized, but unissued, voting shares were allocated to certain callable convertible "capital notes." When the capital notes were called by Radwan, around the time of the 1984 offering, the capital note makers converted them to voting shares at the original share price ($1,000 per share before the 30 for 1 split; $33.00 per share after the split).[5] (See Radwan Dep. 88–89; Stanley Decl., 8–5–96, Ex. 6.)

Because of the existence of the allegedly undisclosed capital notes, plaintiffs contend that the 600,000 voting shares represented in the PPM were not the originally authorized, but unissued, shares, as plaintiffs were induced to believe, but were newly authorized shares. Thus, after the 1984 offering, SEIC had issued a total of 1.8 million, not 1.2 million, voting shares of stock, which diluted plaintiffs' interest in SEIC and contravened their preemptive rights. Plaintiffs contend

---

**4.** Plaintiffs, other than Alfadda, purchased shares of SEIC after receiving the prospectus for the 1984 offering. (Alfadda Compl. ¶ 71; Al–Turki Compl. ¶¶ 80–81, 87–89.) Abbar, Zainy, and Kanoo each purchased 10,000 shares of SEIC for $1 million. (Alfadda Compl. ¶ 9.) Al–Turki purchased 150,000 shares for $15 million; Sharbatly purchased 48,000 shares for $4.8 million; A. Alissa purchased 120,000 shares for $12 million, and an additional 10,000 shares for $1 million for the benefit of S. Alissa. (Al–Turki Compl. ¶¶ 80–81, 86–89.)

**5.** Plaintiffs contend that because they paid $1000 per share instead of the $33.00 per share paid by the capital note makers, their shares were sold at a premium, contrary to the representations in the PPM. (Wohl Aff., 5–3–96, Ex. 3, at 2–3.) Plaintiffs also contend that the PPM overstated the value of SEIC, which resulted in plaintiffs paying a premium on their shares. (Alfadda Compl. ¶ 72.)

that the 600,000 shares were issued to cover oversubscriptions of the SEIC voting stock under the 1984 offering and distributed to the makers of the converted capital notes. (*See* Alfadda Compl. ¶¶ 59, 69, 97; Al–Turki Compl. ¶¶ 60, 91, 101; *see also* Radwan Dep. 83, 88–89, 956; Stanley Decl., 8–5–96, Ex. 6; Fenn Dep. 1273–74, 1278.) Alfadda claims that defendants failed to notify him of the 1984 offering, and thus deprived him of his preference.

Two sales of SEIC stock in the United States, totaling 330,000 shares, allegedly contributed to the oversubscription of the 1984 offering: (1) the sale of 180,000 shares to Charles Keating, Chairman of American Continental Corporation ("ACC"); and (2) the sale of 150,000 shares to Al–Turki. (Alfadda Compl. ¶ 76; Al–Turki Compl. ¶ 68.) On May 8, 1984, SEIC telexed ACC in Phoenix to advise that it had accepted ACC's offer to purchase 15% of SEIC (180,000 shares) for $18 million and directed ACC to deposit the money in a New York bank account. (Alfadda Compl. ¶ 81; Al–Turki Compl. 72.) On June 26, 1984, Reilly sent a telex to Al–Turki in Houston accepting his offer to purchase 12.5% of the voting shares of SEIC (150,000 shares) for $15 million and directed Al–Turki to deposit the money in a New York bank account. (Alfadda Compl. ¶¶ 86–87; Al–Turki Compl. ¶¶ 77–81.) Prior to the sale of these 330,000 shares, SEIC allegedly had sold 343,000 voting shares pursuant to the 1984 offering. Thus, SEIC allegedly oversubscribed the offering and diluted plaintiffs' interest.

Plaintiffs also contend that defendants diverted some of the funds from the 1984 offering for the benefit of Fenn, Radwan, and certain favored shareholders of SEIC. These diversions included the purchase of United States Trading Division of Gulf Oil Corporation for $15 million and certain convertible preferred stock in Galveston–Houston Company, an energy services company located in Houston, Texas. (Alfadda Compl. 109–113; Al–Turki Compl. ¶¶ 111–115.)

## C. The French Proceedings

Under French law, an injured party has two avenues for seeking relief. The party may initiate a civil lawsuit in the party's own name, or the party may file a criminal complaint and become a *partie civile* in the criminal proceeding. A *partie civile*, who may be represented by counsel, participates fully in the criminal proceeding. The judge in a criminal case conducts an investigation of the charges, and may order the production of documents and/or compel testimony. If warranted, after the investigation, the investigating judge may refer the matter to trial. If the criminal charges are sustained at trial, the *partie civile* can recover civil damages in the criminal proceeding. (Lefort Decl., 1–10–91, ¶¶ 3–7; Lefort Decl., 10–15–96, ¶ 3; Bouloc Decl., 4–12–95, ¶¶ 4–6.) The burden of proof is the same in criminal and civil proceedings. (Lefort Supp. Decl. ¶ 12.)

In the instant case, as described below, Sharbatly, Al–Turki, and A. Alissa (referred to simply as the "parties") initiated criminal proceedings by filing complaints with the Chief Investigating Judge of the *Tribunal de Grande Instance* in Paris, France. The Chief Investigating Judge referred the matters to the *Tribunal Correctionnel* for trial, which, after trial, ruled against the parties. The parties appealed to the *Cour d'Appel,* the intermediate appellate court, which affirmed the trial court's decision in all respects. The parties appealed again, and the case is presently pending before the *Cour de Cassation,* France's highest court.

### 1. The Investigation

In July and September 1987, Sharbatly filed two complaints before the Chief Investigating Judge in the *Tribunal de Grande Instance* in Paris, based on the alleged fraudulent conduct relating to the 1984 offering, seeking both criminal and civil sanctions. (*See* Lefort Decl., 10–15–96, ¶ 9; Lefort Decl., 10–15–96, Ex. B.) In the July complaint, Sharbatly alleged that the fraudulent activity was "made possible only by the positive actions performed by Mr. JAMAL RADWAN, General Manager of SAUDI EUROPEAN INVESTMENT CORPORATION." The September complaint added more detail to the July complaint and explained that "[s]ince the actual center of the interests of S.E.I.C. is in France, where its subsidiary, the SAUDI EUROPEAN BANK, is located, and since the personnel and the corporate

bodies of S.E.I.C. are also located in France, the fact is that under French law the company's headquarters is in France and the company is subject to the laws of the French Republic." On June 16, 1988, and July 17, 1988, respectively, Al–Turki and A. Alissa filed similar complaints. (Lefort Decl., 10–15–96, Exs. D & F.)

After investigation, the Chief Investigating Judge referred the matters to trial before the *Tribunal Correctionnel* against Radwan, whom he found to be a French national, because "the acts caracterizing [*sic* ] the elements that constitute the offence of fraud were accomplished in PARIS." (Stanley Decl., 12–20–96, Ex. 3, at 15.) He also declared that "the French Criminal Jurisdiction is ... not competent to hear the offences of an irregular increase of capital and the non respect of the preferential right of subscription of the old shareholders" against SEIC because Netherlands Antilles law, not French, applied to those claims. (*Id.*)

### 2. The Decision of the Trial Court

At trial, Sharbatly sought $4.8 million, Al–Turki sought $15 million, and A. Alissa sought $13 million ($12 million for stock purchased on his own behalf and $1 million for stock purchased on behalf of S. Alissa) in civil damages. The parties also sought interest and additional damages against Radwan. On October 3, 1994, the trial court issued its decision. It summarized the charges against Radwan in the following manner:

> disseminating a confidential private-investment information memo, the financial data for which are false as regards the amount of the capital before the subscription, the number of stock shares before subscription, and the amount of equity; sending a series of telexes that gave false information (corroborating the false information contained in the confidential memo) about the amount of the capital, and which presented as a subscription an operation that was in reality a purchase; using only one of two notarial instruments confirming the two successive increases in capital; using fictitious instruments, "capital notes," to

achieve a fictitious internal increase in capital designed to produce securities that were sold to the parties joining in the action, who thought they were subscribing.

(Lefort Decl., 10–15–96, Ex. H, at 3.)

The court also recounted the parties' claims that they were falsely persuaded that: (1) SEIC would be divided into 1.2 million shares after the 1984 offering, when in reality it was divided into 1.8 million shares; (2) the equity before subscription was $68 million, when in reality it was only $30.8 million; and (3) the well-known founding stockholders held one-half of the capital, when in reality most had left the company and held only one-fifth of the capital.

Regarding the capital notes, the trial court found: (1) the existence of the capital notes "was in conformity with Article 4 of the articles of incorporation of SEIC"; and (2) the "capital notes ha[d] been carried in the SEIC corporate and consolidated accounts since 1980, the year of their subscription." (*Id.* at 6.) The court also found that the existence of the capital notes, made by AIC, Dalia Products Corporation ("Dalia"), and North South Finance Corporation ("NSFC"), was evident from correspondence to Sharbatly, dated September 21, 1982, and November 18, 1983.[6] (*Id.* at 7.) Moreover, the court found that "[t]he parties ... could not have made a mistake as regards the total number of SEIC shares following the two increases in capital, since they had at their disposal the SEIC financial statements and the aforementioned attestations and telexes." (*Id.*)

The court did find that certain correspondence contained incorrect information, but concluded that the parties "inevitably made an in-depth study of the company before investing" and "cannot validly maintain" that their investment decisions were premised on that correspondence because: (1) they possessed the financial documents that contained the accurate information; and (2) they were wealthy businessman, in some cases chairmen or directors of banks, planning to invest large sums of money. (*Id.* at 8.) Con-

---

**6.** Dalia and NSFC were corporations consisting of 17 Saudi Arabian businessmen. (Wohl Aff., 9– 6–96, Ex. 6.)

sidering the above factors the court concluded that the parties had failed to prove:

> the fictitious nature of the capital notes or of the internal increase in capital, or of a lie concerning the true number of shares.

(*Id.*)

The court also rejected the parties' assertion that they were deceived into believing that they were purchasing newly issued shares, when in reality they purchased old shares in a secondary market.[7] The court found that the evidence established both the existence of the secondary market and the parties' knowledge of it. (*Id.* at 10.) The court noted that A. Alissa was specifically informed that his investment was made through the secondary market, and that in any event, each of the parties paid for their shares after the subscription closing date. (*Id.*)

## II. Counts VII–IX

Counts VII–IX concern the sale and reorganization of SE Bank (a French grandchild subsidiary of SEIC), into two French banks, Bretonneau and SBP (referred to jointly as the "bank defendants"). In 1989, SE Bank's name was changed to Societe de Banque Privee. (This was the original Societe de Banque Privee, which will be referred to as "OSBP"). Plaintiffs contend that Bretonneau and SBP, among others, conspired to "hinder, delay and defraud creditors of SE Bank, including plaintiffs" by transferring the business, operations, and assets of OSBP to a new entity, SBP, and reducing OSBP to an insolvent shell. OSBP was renamed Bretonneau, while the real business and assets of SE Bank were allegedly maintained by SBP. (Alfadda Compl. ¶¶ 3, 114; Al–Turki Compl. ¶ 3, 116.) The individuals responsible for SBP's and Bretonneau's alleged conspiracy, Francis Bouygues, Olivier Bouygues, and Jean–Francis Fonlupt, are all non-defendant French nationals.

As part of the bank defendants' alleged scheme to hinder, delay, and defraud creditors, plaintiffs' allege that the bank defendants (1) misled New York banking regu-

lators into approving the closure of SE Bank's New York agency ("SE Bank–NY"); and (2) transferred "files, loans, notes and other papers evidencing assets worth millions of dollars from SE Bank–NY to its home office in Paris." (Alfadda Compl. ¶ 121; Al–Turki Compl. ¶ 123.)

## DISCUSSION

The Court first sets forth the basis for its discussion of what it perceives to be two distinct categories of claims in the instant actions. Counts VII–IX, which arise from the 1989 sale and reorganization of SE Bank, derive from a common nucleus of operative fact distinct from plaintiffs' 1984 securities fraud and related allegations (Counts I–VI). As such, the Court concludes that Counts VII–IX arise from a separate case or controversy under Article III of the Constitution. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

Plaintiffs' claims against the SEIC defendants concern only the securities fraud and related allegations (Counts I–VI), and thus the SEIC defendants' motions relate only to those claims. Plaintiffs' claims against SBP include both categories of claims, and SBP's motions are directed to both categories. However, even SBP's motion papers recognize that different analyses may be appropriate for the two categories of claims. (*See. e.g.,* SBP's Memorandum in Support of Motion to Dismiss for Lack of Personal Jurisdiction, or in the Alternative, Under Forum Non Conveniens, 3–18–94; SBP's Memorandum in Support of Motion for Summary Judgment, 5–3–96.) Because plaintiffs' claims fall into two distinct categories and because some of defendants' motions are directed at only one of the categories, the Court believes it is appropriate to discuss Counts I–VI and Counts VII–IX separately.

### I. Counts I–VI

#### A. Issue Preclusion as to *Al–Turki* Plaintiffs

The Court first considers the standard for reviewing the SEIC defendants' motion.

---

**7.** It is not clear (but is ultimately not relevant) whether this claim, *i.e.,* that the *Al–Turki* plaintiffs unknowingly purchased their shares as part of a secondary market as opposed to purchasing them under the terms of the 1984 offering, is being pursued by the *Al–Turki* plaintiffs in the instant action.

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. Proc. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]he mere existence of *some* alleged factual dispute ... will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ Issue preclusion bars relitigation of issues actually litigated and necessary to the outcome of a prior action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).[8] The doctrine applies to issues decided by the courts of foreign countries. *See, e.g., Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1196 (2d Cir.1971) (barring relitigation of West German corporation's legal status based on previous decision of West German court); *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F.Supp. 658, 666 (S.D.N.Y.1996) (recognizing prior breach of contract decision of Saudi Arabian court, but denying preclusion because of differing standards of proof); *Scheiner v. Wallace*, 832 F.Supp. 687, 694–95 (S.D.N.Y.1993) (barring relitigation of plaintiffs' breach of contract

claim based on previous decision of British court).

■ The SEIC defendants claim that the October 3, 1994, judgment of the *Tribunal Correctionnel* (the "French judgment") bars the *Al–Turki* plaintiffs' claims against them in the *Al–Turki* action.[9]

To resolve the SEIC defendants' motion, the Court must determine (1) whether the French judgment is entitled to recognition by this Court; and (2) if so, the extent to which the Court should accord preclusive effect to the French judgment under the principles of issue preclusion. *See Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.*, 470 F.Supp. 610, 614–15 (S.D.N.Y.1979).

### 1. Recognition of French Judgment

■ In cases involving federal questions, federal courts generally apply federal law to determine whether to recognize a foreign country judgment. *See, e.g., Omega Importing*, 451 F.2d at 1196–97 (recognizing West German judgment in trademark infringement action); *Gordon & Breach Science Publishers S.A. v. American Institute of Physics*, 905 F.Supp. 169, 178–79 (S.D.N.Y.1995) (applying federal law to determine whether to recognize Swiss and German judgments in Lanham Act action); *United States v. United States Currency in the Amount of $294,600*, 1992 WL 170924, *5 (E.D.N.Y.1992) (recognizing Canadian judgment in federal forfeiture action).

The Supreme Court expressed the general principles guiding the recognition of foreign country judgments in *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895):

[W]e are satisfied that where there has been an opportunity for a full and fair trial abroad before a court of competent juris-

---

**8.** Issue preclusion, sometimes referred to as collateral estoppel, can be contrasted with claim preclusion, sometimes referred to by the more generic term of res judicata. The Supreme Court explained the difference in *Parklane Hosiery*. "Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated

and necessary to the outcome of the first action." *Parklane Hosiery*, 439 U.S. at 326 n. 5, 99 S.Ct. at 649 n. 5. This Court will adhere to the more descriptive terms of issue and claim preclusion.

**9.** The fact that the French judgment is on appeal to France's highest court does not bar application of the doctrine of issue preclusion to the judgment. *Williams v. Commissioner of Internal Revenue*, 1 F.3d 502, 504 (7th Cir.1993) (Posner, J.); Restatement (Second) of Judgments § 13, comment f, at p. 135 (1980).

diction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh. . . .

*Id.* at 202–03, 16 S.Ct. at 158–59; *see also Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir.1987) (federal courts generally recognize foreign country judgments "whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy") (citing *Hilton*, 159 U.S. at 202–03, 16 S.Ct. at 158–59).

The *Al–Turki* plaintiffs selected the French forum which decided the issues against them so there is no question that it had jurisdiction. Moreover, plaintiffs do not claim that the French judgment was tainted by fraud nor do they point to a public policy which the French judgment offends. In fact, most of their arguments against recognition, to the extent that they are relevant at all, address the question whether the Court should accord preclusive effect to the French judgment, an issue distinct from recognition.

One argument, however, addresses recognition. In *Hilton*, the Supreme Court held that, in certain circumstances, a foreign country judgment will be denied recognition for want of reciprocity, that is, because the foreign country does not recognize United States or other foreign country judgments. *Hilton*, 159 U.S. at 210, 16 S.Ct. at 161 (denying recognition to French judgment for lack of reciprocity). Relying on *Hilton*, the *Al–Turki* plaintiffs contend that this Court should not recognize the French judgment for lack of reciprocity.

■ Lack of reciprocity is not a bar to recognition for at least two reasons. First, plaintiffs have failed to set forth any facts to establish that France continues not to accord recognition to foreign country judgments, as it did not in 1895 when *Hilton* was decided. The only evidence in the record is to the contrary. (Lefort Decl., 10–15–96, ¶ 22 (citing C.Pr.Civ. 509).) Second, the reciprocity requirement has not recently been recognized by the Second Circuit or by New York state courts. *See Cunard Steamship Co. v. Salen Reefer Servs. A.B.*, 773 F.2d 452, 460 (2d Cir.1985) (quoting *Direction der Disconto-Gesellschaft v. United States Steel Corp.*, 300 F. 741, 747 (S.D.N.Y.1924) (L.Hand, J.), *aff'd*, 267 U.S. 22, 45 S.Ct. 207, 69 L.Ed. 495 (1925)); *see also* Restatement (Second) Conflict of Laws § 98, Comment e & Reporter's Note (noting that New York has rejected the doctrine of reciprocity and citing cases).

Thus, the Court will recognize the French judgment. of course, recognition of the French judgment does not of itself mean that the Court will accord it preclusive effect in this case, which necessarily requires a close analysis of the law and the facts.

### 2. The Preclusive Effect of the Judgment

#### a. Whose Law Should Apply

The first issue the Court must address to determine the extent of the preclusive effect it should accord the French judgment is whose law of preclusion it should apply. The sparse case law dealing with this issue leaves its resolution in some doubt.

Federal courts in this district have generally applied New York's law of issue preclusion to determine the preclusive effect of foreign country judgments on state law claims. *See, e.g., Alesayi Beverage*, 947 F.Supp. at 666; *Scheiner*, 832 F.Supp. at 694; *Fairchild, Arabatzis & Smith*, 470 F.Supp. at 616–17. In each of these cases, however, the court explained that the New York courts which had given preclusive effect to foreign country judgments had generally not specified the source of the applicable law. *Alesayi Beverage*, 947 F.Supp. at 666 n. 15; *Scheiner*, 832 F.Supp. at 694 n. 2; *Fairchild, Arabatzis & Smith*, 470 F.Supp. at 616.

In *Scheiner* and *Fairchild*, which concerned the preclusive effect of a British judg-

ment, the courts concluded that British law was similar to New York law, making a conclusive determination as to which law applied unnecessary. The *Alesayi* court simply applied New York law, without detailed analysis, to determine the issue-preclusive effect of a Saudi Arabian judgment. Thus, these courts' application of New York law is not conclusive nor particularly persuasive.

When applying principles of issue preclusion to federal law claims, courts in this circuit have generally applied federal law, but have not more clearly articulated the relevant principles underlying the choice of law determination. *See, e.g., Omega Importing,* 451 F.2d at 1195 (applying federal law to preclude relitigation of issue determined by West German court without discussing choice of law issue); *United States Currency in the Amount of $294,600,* 1992 WL 170924, at \*5 (applying federal law to preclude relitigation of issue determined by Canadian court without discussing choice of law issue).

On the other hand, there are contrary cases suggesting that foreign law is the appropriate source of an issue preclusion determination of a court sitting in the United States. *See, e.g. Watts v. Swiss Bank Corp.,* 27 N.Y.2d 270, 317 N.Y.S.2d 315, 318–19, 265 N.E.2d 739, 742 (Ct.App.1970) (recognizing that New York would normally apply foreign country's *claim* preclusion rules); *Schoenbrod v. Siegler,* 20 N.Y.2d 403, 283 N.Y.S.2d 881, 885, 230 N.E.2d 638, 641 (Ct.App.1967) ("there is no reason to give more conclusive effect to a foreign judgment than it would be accorded by the courts of the jurisdiction which rendered it"); *Bata v. Bata,* 39 Del. Ch. 258, 163 A.2d 493, 504 (Sup.Ct.1960) (same), *cert. denied,* 366 U.S. 964, 81 S.Ct. 1926, 6 L.Ed.2d 1255 (1961).

In a section relating to both claim and issue preclusion, the Restatement of Foreign Relations Law recognizes the absence of case law on this issue. The Restatement provides an open-ended rule stating that a foreign country judgment should ordinarily have no greater effect than it has in the country in which it was rendered. "However, no rule prevents a court in the United States from giving greater preclusive effect to a judgment in a foreign state than would be given

in the courts of that state." Restatement (Third) Foreign Relations Law § 481, Comment c. *see also id.* Reporters' Note 3. In light of the somewhat contradictory case law and the ambivalent Restatement position, the Court will attempt to explore the policies underlying recognition of foreign-country judgments, and how that might influence issue-preclusion determinations.

The most common reason given for recognizing the judgments of foreign countries is comity. *See Hilton,* 159 U.S. at 163, 16 S.Ct. at 143 ("The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call the comity of nations.' "). Commentators have criticized the term because its uncertain meaning provides an inadequate explanation for why a particular foreign country judgment should be enforced. *See, e.g.,* Robert C. Casad, *Issue Preclusion and Foreign Country Judgments: Whose Law?,* 70 Iowa L.Rev. 53, 58 (1984) (comity is a " 'general mode of expression that at most expresses an attitude or disposition and on analysis is simply circular' ") (quoting Arthur T. von Mehren & Donald T. Trautman, *Recognition of Foreign Adjudications: a Survey and a Suggested Approach,* 81 Harv. L.Rev. 1601, 1603 (1968)); Willis L.M. Reese, *The Status in this Country of Judgments Rendered Abroad,* 50 Colum. L.Rev. 783, 784 (1950) (comity "state[s] but do[es] not explain the arrived-at result").

Because the term comity is inadequate to resolve the choice of law issue presented, the Court will first examine the policies underlying issue preclusion in general and then attempt to apply those policies to the recognition of foreign country judgments. In *Baldwin v. Iowa State Traveling Men's Ass'n,* 283 U.S. 522, 51 S.Ct. 517, 75 L.Ed. 1244 (1931), the Supreme Court succinctly stated the general purpose for giving effect to prior judgments. "Public policy dictates that there be an end to litigation; that those who have contested an issue shall be bound by the result of the contest; and that matters once tried shall be considered forever

settled as between the parties." *Id.* at 525, 51 S.Ct. at 518; *see also Parklane Hosiery,* 439 U.S. at 326, 99 S.Ct. at 649 (issue preclusion "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation"); *Blonder-Tongue Labs., Inc. v. University of Illinois Found.,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971) ("[i]n any lawsuit where a defendant ... is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources").

Thus, issue preclusion has a dual purpose: (1) bringing an end to litigation once the party to be bound has had a fair opportunity to litigate the issue; and (2) promoting judicial economy. However, when one forum's court is applying issue preclusion to the decisions of a second forum's court, other policy considerations are important as well. If not, courts would always apply their own rules of issue preclusion to determine the preclusive effect of foreign judgments, which is not the case. *See* Restatement (Second) of Conflict of Laws § 95 (Supp.1988) (stating general rule that "[w]hat issues are determined by a valid State judgment is determined, subject to constitutional limitations, by the local law of the State where the judgment was rendered").

The Supreme Court identified at least one of these additional considerations in *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). In *Marrese,* an antitrust case concerning claim preclusion, the Court relied on the Full Faith and Credit Act, 28 U.S.C. § 1738, and principles of federalism, to hold that federal courts are generally barred from giving a state court judgment greater preclusive effect than the State which rendered the judgment.[10] *Id.* at 384–85, 105 S.Ct. at 1334.

The Court explained:

If we had a single system of courts and our only concerns were efficiency and finality, it might be desirable to fashion claim preclusion rules that would require a plaintiff to bring suit initially in the forum of most general jurisdiction, thereby resolving as many issues as possible in one proceeding.... The decision of the Court of Appeals approximates such a rule inasmuch as it encourages plaintiffs to file suit initially in federal district court and to attempt to bring any state law claims pendent to their federal antitrust claims.

. . . . .

[W]e have parallel systems of state and federal courts, and the concerns of comity reflected in § 1738 generally allow States to determine the preclusive scope of their own courts' judgments.... We therefore reject a judicially created exception to § 1738 that effectively holds as a matter of federal law that a plaintiff can bring state law claims initially in state court only at the cost of forgoing subsequent federal antitrust claims.

*Id.* at 385–86, 105 S.Ct. at 1334–35 (citations omitted).

Thus, the Court decided that federalism principles preclude the federal courts from fashioning federal claim preclusion rules which would discourage litigants from pursuing their state law claims in state court in contravention of the State's own claim preclusion rules. This federalism principle may (or may not) apply with equal force to the doctrine of issue preclusion. In any event, applying the Full Faith and Credit Act, United States courts generally apply the rendering state's rules to their issue-preclusion determinations. *See, e.g., Aries Realty, Inc. v. AGS Columbia Assocs.,* 751 F.Supp. 444, 448–49 (S.D.N.Y.1990) (applying South Carolina rules of issue preclusion to bar securities fraud and RICO causes of action); *Deutsch v. Integrated Barter Int'l. Inc.,* 700 F.Supp. 194, 196 (S.D.N.Y.1988) (applying New York rules of issue preclusion to bar securities fraud cause of action) (citing *Migra*

---

10. Some commentators have expressed the opinion that, among the States of the Union, the Due Process Clause requires the second forum to apply the judgment-rendering forum's claim preclusion rules. Eugene F. Scoles & Peter Hay, Conflict of Laws § 24.2 n. 8 (2d ed.1992) (citing Allan D. Vestal, Res Judicata/Preclusion 482–83 (1969)).

*v. Warren City School District Bd. of Ed.,* 465 U.S. 75, 80–83, 104 S.Ct. 892, 895–97, 79 L.Ed.2d 56 (1984)); *see also* Restatement (Second) of Conflict of Laws § 95 (Supp. 1988) (stating general rule).

The Full Faith and Credit Act and federalism principles find their basis in the Constitution. The Act is the legislative implementation of the Full Faith and Credit Clause of the Constitution, U.S. Const., art. IV, § 1, and requires courts within the United States to recognize and give effect to judgments of the courts of the several states. It applies to the recognition of state court judgments in the courts of sister states and federal courts, and the recognition of federal court judgments in state courts. 28 U.S.C. § 1738; *Stoll v. Gottlieb,* 305 U.S. 165, 170, 171–72, 59 S.Ct. 134, 136–37, 138, 83 L.Ed. 104 (1938). Federalism principles are reflected in the structure of the Constitution, and recognize that the States of the Union govern as joint sovereigns with the federal government. This federalist structure, among other things, provides a check on the power of the federal government. *Gregory v. Ashcroft,* 501 U.S. 452, 457–59, 111 S.Ct. 2395, 2399–2400, 115 L.Ed.2d 410 (1991).

Neither the Full Faith and Credit Act nor the principles of federalism apply to the recognition of foreign country judgments. "Of course, significant differences come into play when we move from the federal system to the international arena. In the latter, no full faith and credit clause is operative." Ruth B. Ginsburg, *Judgments in Search of Full Faith and Credit: The Last–In–Time Rule for Conflicting Judgments,* 82 Harv. L.Rev. 798, 805 (1969). It is thus not clear that federal courts should defer to foreign countries' issue-preclusion rules. The unlikely fear that litigants would subordinate their foreign-country—as opposed to state law—claims to pursue federal claims in a federal court would generally be of no, or at least very little, moment to a federal court. Moreover, United States policy considerations may differ from those of the foreign country, or, more likely, the methods by which the foreign country achieves similar policy objectives may differ.[11]

■ For example, in the instant case, France may utilize procedural methods other than issue preclusion to avoid repetitive litigation, provide fairness to litigants, and conserve judicial resources. Discovery may be broad in criminal proceedings, but restricted in civil proceedings. Also, the victor in a prior criminal/civil proceeding may be allowed to submit evidence of the prior proceeding in the subsequent civil proceeding to avoid inconsistent results.[12] Regardless of the mechanisms utilized by a foreign court to achieve its objectives, a United States court should not be confined to using the foreign court's mechanisms or else forgo achieving its own objectives.[13] Thus, the Court concludes that a federal court should normally apply either federal or state law, depending on the nature of the claim, to determine the preclusive effect of a foreign country judgment.[14] *Cf. Carl Zeiss Stiftung v. V.E.B.*

---

**11.** The Court notes that the evidence before it indicates that a French court would accord the French judgment at least some preclusive effect. The SEIC defendants' expert on French law, Dominique Lefort, claims that the French judgment would have preclusive effect on a subsequent civil action in France. (*See* Lefort Decl., 10–15–96, ¶ 20; Lefort Supp. Decl. ¶¶ 10–11). The *Al–Turki* plaintiffs' expert, Bernard Bouloc, disagrees. (*See* Bouloc Decl., 4–12–95, ¶ 7.) Noticeably, however, Bouloc fails to contradict directly Lefort's specific assertions relating to preclusion, and instead quotes a single paragraph from a French case, which Lefort distinguishes.

**12.** An interesting fictional dialog, which includes these as well as other distinctions between French and United States law, can be found in Rudolf B. Schlesinger et al., Comparative Law Casebook, 492–97 (1988).

**13.** One commentator has argued that according greater preclusive effect to a foreign country judgment than that accorded in the rendering country may defeat the expectations of the losing party and yield an unanticipated benefit to the winner. Robert C. Casad, *Issue Preclusion and Foreign Country Judgments: Whose Law?,* 70 Iowa L.Rev. 53, 75 (1984). To the extent this concern is relevant, the Court believes that the domestic doctrine of issue preclusion sufficiently protects litigants from any resulting unfairness in its application.

**14.** There may, of course, be exceptions to the general rule. For example, if there are inconsistent foreign country judgments, it may be inappropriate to apply the "last judgment" rule—*see Treinies v. Sunshine Mining Co.,* 308 U.S. 66, 78, 60 S.Ct. 44, 50–51, 84 L.Ed. 85 (1939)—or to

*Carl Zeiss, Jena,* 293 F.Supp. 892, 908 (S.D.N.Y.1968) (Mansfield, J.) (noting that federal courts would not be prevented from according preclusive effect to West German judgment merely because West German courts would not give such effect to them), *aff'd,* 433 F.2d 686 (2d Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971).

### b. Applying Principles of Issue Preclusion

■ Under federal law, four elements must be met for issue preclusion to apply: (1) the issues of both proceedings must be identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there must have been "full and fair opportunity" for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits. *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995). Because the issue in this case is the preclusive effect of a foreign country judgment, the Court recognizes that additional factors may be relevant. Professors von Mehren and Trautman identified five factors they deemed relevant to a court's determination of the preclusive effect of a foreign country judgment:

> We believe that at least five policies are important: a desire to avoid the duplication of effort and consequent waste involved in reconsidering a matter that has already been litigated; a related concern to protect the successful litigant, whether plaintiff or defendant, from harassing or evasive tactics on the part of his previously unsuccessful opponent; a policy against making the availability of local enforcement the decisive element, as a practical matter, in the plaintiff's choice of forum; an interest in fostering stability and unity in an international order in which many aspects of life are not confined to any single jurisdiction; and, in certain classes of cases, a belief that the rendering juris-

diction is a more appropriate forum than the recognizing jurisdiction, either because the former was more convenient or because as the predominantly concerned jurisdiction or for some other reason its views as to the merits should prevail.

Arthur T. von Mehren & Donald T. Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach,* 81 Harv. L.Rev. 1601, 1603–04 (1968). The first two concerns are relevant to all issue preclusion determinations, while the other three concerns appear to relate specifically to foreign country judgments. The Court will first apply the four elements of issue preclusion identified by the Second Circuit, and then, if necessary, determine whether any policy considerations argue against the Court applying the doctrine of issue preclusion to the French judgment in this case.

■ To establish a claim for securities fraud under section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), plaintiffs must show that defendants " 'acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury.' " *Feinman v. Dean Witter Reynolds, Inc.,* 84 F.3d 539, 540 (2d Cir.1996) (quoting *In re Time Warner Securities Litig.,* 9 F.3d 259, 264 (2d Cir.1993), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994)). Generally, "reasonable reliance must be proved as an element of a securities fraud claim." *Harsco Corp. v. Segui,* 91 F.3d 337, 342 (2d Cir.1996).

■ The French court determined that the *Al–Turki* plaintiffs possessed accurate financial information relating to their investment in SEIC and did not rely on certain correspondence that contained inaccurate information. Moreover, the French court held that the *Al–Turki* plaintiffs failed to prove "the fictitious nature of the capital notes or of the internal increase in capital, or of a lie concerning the true number of shares." (Lefort Decl., 10–15–96, Ex. H, at 8.) The Court

apply a doctrine of preclusion at all. This Memorandum and Order is not meant to express an opinion as to the possible exceptions to the doc-

trine of issue preclusion as applied to foreign country judgments.

finds that these issues are sufficiently identical to the issues the *Al–Turki* plaintiffs would have to establish to sustain their securities fraud claims, and that these issues were actually litigated. *See Murphy v. Gallagher,* 761 F.2d 878, 882–83 (2d Cir.1985) (issues in state court corporate dissolution proceedings were identical to issues in securities fraud action); *Aries Realty,* 751 F.Supp. at 449 (elements of securities claims were essentially the same as prior South Carolina fraud claims); *Deutsch,* 700 F.Supp. at 197–98 (prior state court mortgage foreclosure action resolved issues of alleged misrepresentation, scienter, and reliance so that issue preclusion in securities fraud case was appropriate); *Kaufman v. BDO Seidman,* 984 F.2d 182, 184 (6th Cir.1993) (prior state law claim for professional misconduct resolved issues relevant to securities fraud claim); *Capital Investments, Inc. v. Bank of Sturgeon Bay,* 430 F.Supp. 534, 538–39 (E.D.Wis.1977) (state court finding that plaintiffs' did not rely on alleged misrepresentations in negligence action barred relitigation in federal securities fraud action), *aff'd,* 577 F.2d 745 (7th Cir.1978).

The third element is whether the *Al–Turki* plaintiffs had a full and fair opportunity to litigate the issues in the prior proceeding. The *Al–Turki* plaintiffs do not deny that they were represented in the French proceedings nor that they had a full and fair opportunity to litigate the issues that arose in those proceedings. Rather, the *Al–Turki* plaintiffs claim that the French judgment should be denied preclusive effect because: (1) they were denied a full and fair opportunity to litigate against all the defendants who are named in the instant actions; and (2) evidence obtained through discovery in the instant actions, which was not available in the French proceedings, support their claims. (Pl. Mem., 12–23–96, at 17–19.)

The *Al–Turki* plaintiffs have cited no cases in support of their argument that a "full and fair opportunity" to litigate requires an identity of parties. The law is to the contrary.

*See Parklane Hosiery,* 439 U.S. at 328–29, 99 S.Ct. at 650–51. Nor have they cited any cases to support their apparent contention that a difference in French procedures or their discovery of allegedly new information defeats the SEIC defendants' otherwise well-supported motion.[15]

As to the fourth element of issue preclusion, even a cursory reading of the French judgment makes clear that the *Al–Turki* plaintiffs' possession of accurate financial information and their lack of reliance on inaccurate information was necessary to the judgment. The *Al–Turki* plaintiffs are precluded from relitigating the previously litigated issues, which are necessary to establish a claim for securities fraud. Thus, the SEIC defendants' motion for summary judgment as to Count II of the Second Amended Complaint in the *Al–Turki* action for securities fraud is granted.

To the extent that the *Al–Turki* plaintiffs' RICO claims (Count I) are predicated on the alleged securities fraud violations or on mail or wire fraud claims relating to the securities fraud violations, they are similarly dismissed. *See Kaufman,* 984 F.2d at 185 (barring relitigation of causation issue required to sustain RICO claim because of prior litigation in state court); *see also Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 18–19 (2d Cir.1983) (dismissing RICO claim where predicate securities fraud violations were dismissed), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *Antonoff v. Bushell,* 1991 WL 95433, at *7 (S.D.N.Y.1991) (dismissing RICO claim where predicate securities fraud violations were dismissed, and where alleged mail and wire fraud violations related to securities fraud violations). The *Al–Turki* plaintiffs argue, in conclusory fashion, that their RICO claims "involve a myriad of issues" not resolved by the French proceeding. (Pl. Mem., 12–23–96, at 15.) However, a review of the complaint does not reveal that the *Al–Turki* plaintiffs' RICO claims are predicated on anything but the

---

**15.** The Court notes that the allegedly new information cited by the *Al–Turki* plaintiffs includes testimony that certain documents contained incomplete financial information. Although not referring to the same documents, the French court acknowledged that certain correspondence contained inaccurate information, but concluded that the *Al–Turki* plaintiffs knew the accurate financial information and did not rely on the inaccurate information.

alleged securities fraud violations and related mail and wire fraud claims. (*See* Al–Turki Compl. ¶¶ 135–149.) The *Al–Turki* plaintiffs have not supplied any factual support to the contrary.

The four elements of issue preclusion are satisfied as to the *Al–Turki* plaintiffs.[16] The three additional factors identified by von Mehren & Trautman, *supra*, also support giving the French judgment preclusive effect. First, plaintiffs' choice of a United States forum appears unrelated to any enforcement interest because they claim that defendants have removed relevant assets to France. Second, the Court's interest in fostering stability and unity, to the extent it is relevant, favors giving effect to the French judgment. Third, the Court believes that France, the rendering jurisdiction, is a more appropriate forum, both because of convenience, and because France, the home country to all the defendant banks and much of the alleged conduct, has a greater interest in the litigation.

Thus, the *Al–Turki* plaintiffs are barred from relitigating Counts I–II (the securities fraud and RICO claims) of the Second Amended Complaint in the *Al–Turki* action.

**B. State Law Claims (Counts III–VI)**

▮▮▮ "When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims." *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir.1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). Thus, the *Al–Turki* plaintiffs' related pendent state law claims (Counts III–VI) are dismissed.[17]

**C. Forum Non Conveniens**

▮▮▮ The doctrine of forum non conveniens provides an alternative basis for dismissing Counts I–VI in the *Al–Turki* action, and an independent basis for dismissing Counts I–VI in the *Alfadda* action. The discretionary doctrine of forum non conveniens allows a court, in which jurisdiction and venue are proper, to decline to exercise jurisdiction over the case because a balance of factors of convenience strongly suggest that the litigation should proceed elsewhere. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507–08, 67 S.Ct. 839, 842–43, 91 L.Ed. 1055 (1947). Merely because plaintiffs allege securities fraud violations does not preclude a court from exercising its discretion to dismiss the action on the ground of forum non conveniens. *Allstate Life Ins. v. Linter Group Ltd.*, 994 F.2d 996, 1002 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993); *Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944, 945 (1st Cir. 1991) (Breyer, C.J.) ("federal courts possess the power to invoke the forum non conveniens doctrine in a private action claiming a violation of American anti-fraud securities statutes"), *cert. denied*, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992).

▮▮▮ *Gilbert* set forth private and public interest factors relevant to a determination of a court's forum non conveniens determination. Private factors include: "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained." *Id.* at 508, 67 S.Ct. at 843. Public interest factors include the administrative difficulties resulting

---

**16.** Although S. Alissa was not formally a party to the French proceedings, A. Alissa attempted to recover S. Alissa's investment. Thus, for the purposes of preclusion, S. Alissa's interests were "adequately represented by another with the authority of representation" and his claims are barred by the judgment. See *Expert Elec., Inc. v. Levine*, 554 F.2d 1227, 1233 (2d Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977).

**17.** Count VI is a claim for successor liability against SBP on the ground that SBP is liable for SE Bank's liabilities resulting from the *Al–Turki* plaintiffs' securities fraud and related causes of action. Because these causes of action are barred by the doctrine of issue preclusion, the Court declines to exercise jurisdiction over the *Al–Turki* plaintiffs' related state law claims against SBP.

from court congestion; the interest in not imposing jury duty on the people of a community that has no relation to the litigation; and the local interest of having localized controversies decided at home. *Id.*

■ The Court concludes that both the private and public interest factors favor dismissal. All of the plaintiffs are foreign nationals residing in Saudi Arabia. All of the defendants have a strong connection with France, and none reside in the United States. Two of the corporate defendants, SEIC and AIC, are Netherlands Antilles companies, whose chairman, Radwan, the only remaining individual defendant, apparently resides in France. All the bank defendants are French banks. Moreover, many of the documents are in French, and most of the alleged conduct occurred outside the United States. In fact, a French Court has already determined that "the elements that constitute the offence of fraud were accomplished in Paris." (Stanley Decl., 12–20–96, Ex. 3, at 15.)

It is true, as the Second Circuit recognized, that certain negotiations and communications for the sale of SEIC shares to ACC and to Al–Turki occurred in the United States. These United States contacts were sufficient to provide subject matter jurisdiction over plaintiffs' securities fraud and RICO claims. *Alfadda v. Fenn,* 935 F.2d 475, 478–80 (2d Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991). However, when weighed against the public and private interest factors noted above, these sales do not tip the balance of conveniences in favor of the United States.

Plaintiffs have made two arguments against dismissal that the Court will address. First, plaintiffs claim that a prior decision of the Court denying defendants' motion to dismiss on the ground of forum non conveniens—*Alfadda v. Fenn,* 1992 WL 44369, at *1 (S.D.N.Y.1992)—is law of the case barring relitigation of this issue. Second, plaintiffs claim that defendants have failed to show that either the Netherlands Antilles or France is a more appropriate forum "to hear all of the causes of action against all of the parties currently before the Court." (Pl. Mem., 12–23–96, at 21.)

■ The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.... Law of the case directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). "The law of the case is a discretionary doctrine that need not be applied when no prejudice results from its omission." *First Nat'l Bank of Hollywood v. American Foam Rubber Corp.,* 530 F.2d 450, 453 n. 3 (2d Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atlantic Airways, Ltd. v. National Mediation Board,* 956 F.2d 1245, 1255 (2d Cir.) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478, at 790), *cert. denied,* 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992).

■ There are a number of reasons why law of the case does not preclude dismissal in this case. First, at the time of the earlier decision of the Court, it noted that "those defendants in the present cases who are also parties to either of the foreign litigations should not have to wage battle on more than one front." *Alfadda,* 1992 WL 44369, at *1. Radwan, the only remaining party to these actions who is also a United States citizen (although not a resident of the United States), has already been subjected in France to a criminal investigation, a criminal/civil trial, and an appeal concerning the subject matter of plaintiffs, securities fraud and common law fraud claims. In the French action, he has been absolved of liability for the claims brought there by the Al–Turki plaintiffs. Radwan should not be forced to wage battle again in the United States.

Second, the Court previously stated that "[t]he present cases are complex, and, viewed from different perspectives, France or the Netherlands Antilles or the United States may appear to be the more convenient forum." However, now that the parties have

engaged in very extensive discovery, it has become apparent that France would be a far more appropriate forum for plaintiffs' claims than the United States. The Court notes that none of plaintiffs' arguments suggest that the United States is a more convenient forum for any of the parties. *See Gilbert,* 330 U.S. at 509–10, 67 S.Ct. at 843–44 (recognizing that plaintiff's "affidavits and argument are devoted to controverting claims as to defendant's inconvenience rather than to showing that the present forum serves any convenience of his own").

Third, since the Court's earlier decision, plaintiffs have amended their complaints to include other claims (Counts VII–IX) relating to SE Bank's sale and the distribution of its assets. As discussed below, the Court does not have subject matter jurisdiction over these claims, and in any event, the doctrine of forum non conveniens would apply. The addition of these claims further demonstrates that France's interest in this litigation is superior to that of the United States.

Fourth, at the time of the Court's earlier decision, Fenn, a United States citizen was still a party. Both actions have since been dismissed as to Fenn.

For the above reasons, the Court declines to apply the doctrine of law of the case to its previous Memorandum and Order.

Plaintiffs' second argument is that defendants failed to show that "either the Netherlands Antilles or France would be the appropriate forum to hear all of the causes of action against all of the parties currently before this Court." Plaintiffs misapprehend defendants' burden, which is to show that the balance of conveniences strongly favors trial in an alternate forum. *Gilbert,* 330 U.S. at 507–08, 67 S.Ct. at 842–43. The Court finds that the balance of conveniences favors trial in France.

 To the extent plaintiffs claim that French law is not coextensive with United States law, such a claim does not bar dismissal on the basis of forum non conveniens. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 253 n. 19 & 254, 102 S.Ct. 252, 264 n. 19 & 265, 70 L.Ed.2d 419 (1981) (The possibility of an unfavorable change in law should not be given substantial weight in a forum non conveniens inquiry unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all.") Plaintiffs do not contend that French courts could provide them with anything but complete relief, if plaintiffs were to sustain their claims. To the extent plaintiffs might be concerned that some defendants are not amenable to process in France, the Court will condition its order of dismissal on defendants making themselves amenable to French process. *See Gilbert,* 330 U.S. at 506–07, 67 S.Ct. at 842 (application of the doctrine presupposes at least two forums in which defendant is amenable to process).

## II. Counts VII–IX

Counts VII–IX, relating to the sale and reorganization of SE Bank, were added to plaintiffs' complaints after the Second Circuit determined that this Court had jurisdiction over the subject matter of plaintiffs' securities fraud and RICO claims, and after this Court denied certain defendants' earlier motions to dismiss those claims on the ground of forum non conveniens. Accordingly, those decisions do not affect the following discussion.[18]

### A. Subject Matter Jurisdiction

 The burden of establishing subject matter jurisdiction rests on the party asserting jurisdiction. *Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942). Lack of subject matter jurisdiction may be asserted at any time, and may not be waived. *See* Fed. R. Civ. Proc. 12(h)(3). In considering a motion to dismiss for lack of subject matter jurisdiction, the court construes the complaint broadly and

---

**18.** The Court notes that the substance of plaintiffs' claims is that defendants made SE Bank insolvent to avoid paying a potential judgment in the instant actions. Because the *Al–Turki* plaintiffs' securities fraud and related claims are dismissed on the ground of issue preclusion, Counts VII–IX of the *Al–Turki* action are no longer viable. Thus, as applied to the *Al–Turki* action, the discussion of Counts VII–IX provides an alternative basis for dismissal of these claims against the *Al–Turki* plaintiffs.

liberally, consistent with the principle set out in Rule 8(f) of the Federal Rules of Civil Procedure, "but argumentative inferences favorable to the pleader will not be drawn." 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedures § 1350, at 218–19. The parties may submit materials outside the pleadings, including affidavits and deposition testimony, to support or challenge the court's subject matter jurisdiction. *See Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947); *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130 (2d Cir. 1976), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

Count VII, the only federal claim in this category of claims, alleges RICO violations arising from the 1989 sale and reorganization of SE Bank. The RICO statute is silent as to its extraterritorial application. Thus, the Court " 'must ascertain whether Congress would have intended that federal courts should be concerned with specific international controversies.' " *North South Finance Corp. v. Al–Turki,* 100 F.3d 1046, 1051 (2d Cir.1996) (quoting *Alfadda v. Fenn,* 935 F.2d 475, 479 (2d Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991)). In *North South Finance,* a case involving most of the parties to the instant litigation and concerning similar subject matter to Counts VII–IX, the Second Circuit described the relevant inquiry as "the application of RICO to a dispute among groups of foreign companies and foreign nationals, arising out of the 1989 sale and reorganization of a French bank." [19] *Id.* at 1048. The Second Circuit recognized that there is little case law in this circuit concerning the extraterritorial application of RICO, and looked to international securities law and antitrust cases for guidance. *Id.* at 1051.

 To determine whether a court has subject matter jurisdiction over transnational securities fraud violations, the Second Circuit has developed two alternative tests: the "conduct test" and the "effects test." A court will have subject matter jurisdiction under the conduct test "[o]nly where conduct within the United States directly caused" plaintiff's loss. *Id.* (internal quotations omitted). The conduct test "focuses on how the conduct within the United States relates to the alleged fraudulent scheme." *Id.* Under the "effects test," "the United States prohibition of securities fraud 'may be given extraterritorial reach whenever a predominantly foreign transaction has substantial effects within the United States.' " *Id.* (quoting *Consolidated Gold Fields PLC v. Minorco. S.A.,* 871 F.2d 252, 261–62 (2d Cir.1989)).

The Second Circuit noted that the extraterritorial application of the antitrust laws is similar, "but there is more emphasis on the effects of the relevant conduct in the United States, and less emphasis on where the conduct took place." *Id.* "[A]ntitrust liability may attach to anticompetitive conduct occurring outside the United States, but having consequences here, if the conduct is intended to and actually does have an effect on United States imports or exports which the state reprehends." *Id.* at 1052 (citing *United States v. Aluminum Co. of America,* 148 F.2d 416, 443–44 (2d Cir.1945) (L. Hand, J.)).

Noting the different purposes underlying the securities laws and the RICO statute, the Second Circuit commented that, where the predicate acts to a RICO claim are mail and wire fraud, "the effects-oriented approach borrowed from antitrust cases is an equally or even more appropriate test, especially since 'the civil action provision of RICO was patterned after the Clayton Act.' " *Id.* at 1052 (quoting *Agency Holding Corp. v. Malley–Duff & Assoc.,* 483 U.S. 143, 150, 107 S.Ct. 2759, 2764, 97 L.Ed.2d 121 (1987)). Although plaintiffs' complaints allege predicate acts of financial institution fraud and obstruction of justice, in addition to mail and wire fraud, the Court does not believe that it is necessary to examine which test would prove more appropriate in this case. Plaintiffs have failed to show that defendants' United States conduct directly caused their alleged injury, or substantial effects in the United States.

---

**19.** Radwan, SE Bank, and Alef Bank are the only remaining parties to the instant actions that were not parties in *North South Finance.*

Because of the similarity of the facts of this case and those in *North South Finance,* a review of the facts in that case is instructive. In *North South Finance,* the plaintiffs were the holding companies that owned and sold SE Bank, and the majority stockholders of the holding companies. SBP and Bretonneau were two of the defendants. Plaintiffs claimed that SBP and Bretonneau, among others: (1) artificially depressed the sale price of SE Bank by understating the bank's liquidity for financial and regulatory purposes and misusing information drawn from company sources, including SE Bank–NY; and (2) manipulated post-sale transactions (some of them executed in New York) so that contingent payments of the purchase price would be fraudulently reduced or eliminated. *North South Finance,* 100 F.3d at 1048.

As part of their claims, plaintiffs asserted that SBP and Bretonneau, among others, "evaded their payment obligations under the sales agreement by manipulating which entities received the payments on the provisioned loans, reorganizing [OSBP] into two new entities, and closing [OSBP's] New York office." *Id.* at 1050. Plaintiffs alleged that SBP and Bretonneau, among others, concealed their collection of certain loans by transferring money from New York to Paris, and then notifying the New York State Banking Department of its plan to close the New York office. *Id.* Plaintiffs also alleged that SBP and Bretonneau, among others, violated an injunction issued by a federal district court in Arizona, which barred OSBP from reducing its United States assets below $9 million, by continuing to remove assets from the United States. *Id.* The Second Circuit held that plaintiffs' RICO claims failed to support subject matter jurisdiction under the conduct test.

Although not clearly articulated in plaintiffs' complaints, the thrust of their claims appears to be that neither SE Bank nor its alleged successor, Bretonneau, has assets to pay plaintiffs' potential judgment in the instant actions. As plaintiffs explain it, the "essence" of defendants' alleged scheme in the instant actions was to transfer the business, operations and assets of one French bank (SE Bank or OSBP) to another French bank (SBP), reducing the original French bank to an insolvent shell. (Alfadda Compl. ¶ 114; Al–Turki Compl. ¶ 116.)

The only United States conduct alleged to be relevant to the transaction was the closing of SE Bank–NY, which was incidental to the sale and reorganization of the French bank. Even if the bank defendants did deliberately mislead New York banking authorities, a proposition completely devoid of evidentiary support in plaintiffs' papers opposing SBP's motion, the closing of SE Bank's New York agency did not "directly cause" plaintiffs' alleged harm. Rather, the harm to plaintiffs, if any, was caused by the sale of SE Bank's assets in France to another French bank. *See id.* at 1053 (recognizing that plaintiffs' injury was not related to the transfer of assets from New York to Paris, but was caused, if at all, in Paris by defendants' failure to remit plaintiffs' share).

Plaintiffs have also failed to show that the sale and reorganization of SE Bank had substantial effects in the United States. The only allegedly harmed creditors are foreign nationals. Moreover, the internal transfer of SE Bank's documents and assets from the New York agency to its home office in France, without more, does not constitute substantial effects in the United States. The effects of plaintiffs' claims are centered almost entirely in France.

Because the Court lacks subject matter jurisdiction over plaintiffs' RICO claim, it also dismisses plaintiffs' related pendent state law claims (Counts VIII–IX). *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966).

### B. Forum Non Conveniens

In the alternative, the Court dismisses Counts VII–IX of the *Alfadda* and *Al–Turki* complaints on the ground of forum non conveniens.

First, the Court notes that France is an appropriate alternative forum. Both defendants, SBP and Bretonneau, are French banks. Plaintiffs' claims involve the sale and reorganization of SE Bank, also a French bank. Many of the documents are in French; many of the witnesses reside in

France; and most of the alleged conduct occurred in France. Also, defendants themselves acknowledge that the assets they seek to obtain are in France.

Second, the private and public interest factors recognized in *Gilbert* favor such dismissal. *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843. In addition to the French contacts noted above, all of the plaintiffs are foreign nationals residing in Saudi Arabia and most potential witnesses do not reside in the United States. As to public interest factors, the Court sees no reason for imposing plaintiffs' claims on a New York jury nor does it believe that the interests of justice are furthered by hearing this almost entirely foreign claim in the congested courts of the Southern District of New York.

Thus, in its discretion, the Court alternatively dismisses Counts VII–IX of the complaints on the ground of forum non conveniens.

## CONCLUSION

For the reasons set forth above, Counts I–VI of the *Al–Turki* action are dismissed pursuant to the doctrine of issue preclusion, or, in the alternative, pursuant to the doctrine of forum non conveniens. Counts I–VI of the *Alfadda* action are dismissed pursuant to the doctrine of forum non conveniens. Counts VII–IX of both the *Al–Turki* action and the *Alfadda* action are dismissed because the Court lacks subject matter jurisdiction over those claims. Alternatively, Counts VII–IX of both actions are dismissed on the ground of forum non conveniens.

Defendants are directed to file, within 14 days of the date hereof, acknowledgments of *in personam* submission to jurisdiction in France. Failure to do so may necessitate the reopening of Counts I–VI of the *Alfadda* action.

The Clerk is directed to enter judgment dismissing the Second Amended Complaint in the *Al–Turki* action and the Third Amended Complaint in the *Alfadda* action.

SO ORDERED.